**L.T. BRADT and L.T. Bradt, P.C., Appellants,**

**v.**

**W. David WEST, Judy Sebek, Earle Lilly, William J. Delmore III, Piro & Lilly, P.C., Joel Nass, Foundation for Depelchin Children's Center, Baylor College of Medicine, Ernest Kendrick, M.D., Michael D. Cox, Jean Guez, Barbara Taylor Chase Hopkins, Luisa Maria Acevedo Lohner, Ann M. Hodges, Edward J. Hennessy, Hennessy & Zito, Donald B. McFall, McFall & Sartwelle, P.C., Alan Magenheim, Hirsch, Glover, Robinson & Sheiness, P.C., William R. Pakalka, Nancy Locke, Fulbright & Jaworski,**

**Donald M. Hudgins, Hudgins, Hudgins & Warrick, P.C., James H. Barker, Giessel, Stone, Barker & Lyman, P.C., Aetna Casualty & Surety Company, The Automobile Insurance Company of Hartford, Connecticut, Texas Lawyers Insurance Exchange, Sheryl Mulliken Fike, R. Edward Perkins, John Kapacinskas, Wade Quinn, Matt Shafer, Dean Barth, American Home Assurance Company, Lexington Insurance Company, and American Psychiatric Association, Appellees.**

No. 01–94–00284–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 22, 1994.

Rehearing Denied Dec. 22, 1994.

**60**

L.T. "Butch" Bradt, Houston, for appellants.

William J. Delmore, III, Donald M. Hudgins, Alfred C. Koenig, Wayne R. Luck, Houston, Dan Morales, Jorge Vega, Toni Hunter, Michelle F. Wakefield, Austin, Michael Y. McCormick, Paul E. Stallings, Larry R. Veselka, Harold A. Odom, III, Jeffrey R. Parsons, David A. Clark, Keith A. Rowley, Houston, for appellees.

Before DUGGAN, HUTSON–DUNN and PRICE, JJ.

## OPINION

PRICE, Justice (Assigned).*

"The worst of law is that one suit breeds twenty."

—George Herbert, *Jacula Prudentum*

An attorney and his professional corporation appeal summary judgments granted to the defendants in a multi-cause of action lawsuit. In an earlier opinion, we affirmed the trial court's judgment. The appellants moved for rehearing. We hereby overrule the appellants' motion for rehearing, but withdraw our earlier opinion and issue this one in its stead. *Nothing of substance has been changed from our original opinion*; this one is issued in its place *only* to address some arguments made by the appellants in their motion for rehearing.

### I. The Facts

In 1986, spouses Mark Metzger and Judy Metzger (now Sebek) separated. In October of that year, Mr. Metzger (hereinafter "Metzger") filed for divorce. Out of that seemingly innocuous lawsuit, which ultimately settled, sprung four new lawsuits of considerable proportions.

---

* The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

### 1. Lawsuit number one: Metzger's first federal lawsuit

On July 13, 1989, Metzger brought the first lawsuit, filing in federal court. He pursued claims against several defendants, complaining of various acts and omissions that allegedly occurred during the period in which he and Judy Sebek were going through their divorce.

Metzger alleged that the defendants were all participants in a "child abuse enterprise." According to Metzger's pleadings, the enterprise worked as follows. In order to squeeze money from Metzger in a settlement of the divorce action, Earle Lilly, Joel A. Nass, and Piro & Lilly, P.C.—all of whom represented Judy Sebek—decided to make false allegations that Metzger sexually abused one of the couple's three children. In furtherance of the scheme, Sebek claimed that the couple's middle child (of three) told her that Metzger had abused him. The accusation was then reported to mental health care professionals Jean Guez (a psychologist appointed to the case by the judge) and Barbara Taylor,[1] who confirmed the child's accusations. Guez then threatened that she would recommend to the judge that the child be hospitalized, and that Metzger's visitation rights be all but extinguished, if Metzger did not accept a less favorable settlement than he ordinarily would have accepted. Metzger capitulated to the threat. As part of the settlement, the child was put in Depelchin Children's Center, where Ernest Kendrick (from Baylor College of Medicine) headed the child's treatment team. Also on the treatment team were Luisa Maria Acevedo Lohner and Ann M. Hodges. By installing the issue of child abuse in the divorce action, everyone made money from Metzger's misfortune: Judy Sebek's lawyers leveraged a better settlement for Judy, which made money for her and for her attorneys, too, in the form of attorney's fees. All of the health care professionals who evaluated and/or treated the child for the alleged sexual abuse also profited, because Metzger paid, at least in part, for all of their services through the settlement. As indicated above, this description of the alleged "child abuse enterprise" is only from Metzger's pleadings in lawsuit number one, not from any evidence.

Allegedly as a collateral effect of the "child abuse enterprise's" success, a grand jury looked into Metzger's alleged sexual abuse of the child. Michael D. Cox, another health care professional, gave testimony favorable to Metzger before the grand jury. Nevertheless, Metzger was indicted.[2]

Metzger sued Judy Sebek, Earle Lilly, Joel A. Nass, Piro & Lilly, P.C., Jean Guez, Barbara Taylor, Depelchin Children's Center, Ernest Kendrick, Luisa Maria Acevedo Lohner, Ann M. Hodges, and Baylor College of Medicine. He also named other defendants who were eventually dismissed, and, surprisingly, Michael D. Cox, who apparently incurred Metzger's wrath because he told the prosecutor, during a skilled cross-examination before the grand jury during which he was informed that the child had picked Metzger from a photospread when asked to identify the man who had abused him, that he "believe[d] kids." [3]

On August 16, 1990, the federal court dismissed Metzger's case on the ground that "the Court abstains from exercising jurisdiction even if, arguably, that jurisdiction exists."

### 2. Lawsuit number two: Metzger's state lawsuit

### A. The substance of Metzger's lawsuit

Metzger then brought suit in state court, suing the same defendants and making the same allegations. At the time of trial in state court, Metzger's petition asserted the following causes of action:

1. civil conspiracy;

---

1. Barbara Taylor is the appellee listed in the style of this case as "Barbara Taylor Chase Hopkins."

2. The indictment was eventually dismissed because the judge ruled that the child was not competent to testify.

3. The judge in lawsuit number two (in which Cox was also a defendant) expressed shock at the decision to sue Cox, telling Metzger and his attorneys that, rather than a defendant, Cox should have been their "star witness," because he had vigorously supported Metzger before the grand jury.

2. civil conspiracy to extort from and defraud him of property and liberty interests protected by the Texas and United States Constitutions;

3. malicious prosecution;

4. "deprivation of civil rights based upon malicious prosecution";

5. intentional infliction of emotional distress;

6. medical negligence (asserted only against Depelchin, Baylor, Kendrick, Lohner, Cox, and Taylor);

7. negligent infliction of emotional distress (asserted only against Depelchin, Baylor, Kendrick, Lohner, Cox, and Taylor); and

8. civil RICO (Racketeer Influenced and Corrupt Organizations Act)[4].

Aetna Casualty & Surety Company and The Automobile Insurance Company of Hartford, Connecticut, retained Hennessy & Zito to defend Judy Sebek. Texas Lawyers Insurance Exchange retained McFall & Sartwelle to defend Earle Lilly, Joel A. Nass, and Piro & Lilly, P.C. Lexington Insurance Company retained Hirsch, Robinson, Sheiness & Glover to defend Depelchin Children's Center. Lexington Insurance Company and Baylor College of Medicine, which is partially self-insured, retained Fulbright & Jaworski to defend Baylor College of Medicine, Ernest Kendrick, Luisa Maria Acevedo Lohner, Ann M. Hodges, and the particularly unfortunate Michael D. Cox. The American Psychiatric Association paid for part of Luisa Maria Acevedo Lohner's defense. American Home Assurance Company retained Hudgins, Hudgins & Warrick to defend Jean Guez, and Giessel, Stone, Barker & Lyman to defend Barbara Taylor Chase Hopkins.

At trial, L.T. "Butch" Bradt and Joe Alfred Izen, Jr., represented Metzger; Edward J. Hennessy of Hennessy & Zito represented Judy Sebek; Donald M. Hudgins and Sheryl Mulliken Fike of Hudgins, Hudgins & Warrick represented Jean Guez; James H. Barker of Giessel, Stone, Barker & Lyman represented Barbara Taylor Chase Hopkins; Alan Magenheim of Hirsch, Robinson, Sheiness & Glover represented Depelchin Children's Center; Donald B. McFall and R. Edward Perkins of McFall & Sartwelle represented Earle Lilly, Joel A. Nass, and Piro & Lilly, P.C.; and William R. Pakalka and Nancy J. Locke of Fulbright & Jaworski represented Baylor College of Medicine, Ernest Kendrick, Luisa Maria Acevedo Lohner, Ann M. Hodges, and Michael D. Cox. The Honorable W. David West presided. Attorneys John Kapacinskas (of Fulbright & Jaworski), Wade Quinn (of Giessel, Stone, Barker & Lyman), Mat Shafer (of Hirsch, Robinson, Sheiness & Glover), and Dean Barth (of Hennessy & Zito) played minor defense roles in the proceedings.

Trial lasted over a month. During the course of the trial, Judge West twice held Bradt in contempt. One of the contempt charges is the subject of this appeal, and is discussed in detail directly below.

## B. The contempt of court and the verdict

Before trial, the defendants filed a joint motion in limine. In relevant part, the motion asked Judge West

> to instruct plaintiff and his counsel not to mention within the hearing of any member of the Jury Panel ... by the interrogation of witnesses ... or otherwise any of the following matters, either directly or indirectly, nor refer to, nor interrogate concerning, nor otherwise apprise the Jury of any of the following matters until each such matter has been called to the Court's attention out of the presence and hearing of the Jury and a ruling had by the Court as to the competency of each matter outside of the presence and hearing of any members of the Jury or Jury Panel. It is further moved that Plaintiff and his counsel be instructed to apprise each of plaintiff's witnesses of the contents of this Motion, to the end that such Motion not be inadvertently violated by a witness....
>
> . . . . .
>
> That the Court enter an order precluding plaintiff, his attorneys and witnesses from mentioning or offering any evidence or

4. 18 U.S.C. §§ 1961–1968 (1991 & Supp.1994).

testimony that plaintiff has offered to, taken or passed a lie detector test....

Judge West granted the defendants' motion in limine.

One of Metzger's witnesses at trial was Marie Munier, the prosecutor who had presented the case against him to the grand jury. When Bradt was examining Munier regarding the "relevant records" available to her at the time she presented the case to the grand jury, the following occurred:

Q. Okay. So that would not be a separate entry?

A. No. I had information—and I don't know whether I had the actual record or not about his negative polygraph. They were in the papers that Mr. Metzger submitted. So I would say that some of his information was relevant also.

Q. Okay. Negative polygraph.

The judge instructed the jury to disregard the evidence of the negative polygraph. He also stated that he had decided to exclude the evidence of the negative polygraph and that the evidence "has no bearing on the case."

Shortly thereafter, in the same examination, Bradt led Munier through a summary of the "relevant records." As he asked Munier about them one by one, Bradt made a list of the records on a large pad for the jury to view. Despite the judge's previous words, the following occurred during this part of the testimony:

Q. So you have the CPS records—

A. Uh-huh.

Q. —the offense report from the Houston Police Department—

A. Uh-huh.

Q. —you had Barbara Taylor's two letters of October 6th, 1987—

A. (Nods.)

Q. —which are contained in Plaintiff's Exhibit No. 19; you have [nine other documents referred to individually by Bradt]; and then you had a negative polygraph, and that is what you consider to be the relevant record available to—

Mr. Barker: Judge—

Mr. Magenheim: Excuse me, Your Honor—

Mr. Barker: —how can we say it? How can we say it again? He wants to write it down. He wants to say it after the Court has instructed this jury to disregard—this is the most outrageous violation of the Court's orders ... How do we get a fair trial?

This was followed by several more objections and a reproach issued by Judge West to Bradt.

Bradt did not call the matter of the negative polygraph to Judge West's attention and seek a ruling regarding the competency of the evidence before his first mention of the negative polygraph. Before Bradt's second mention of the negative polygraph, the judge had already ruled out the evidence; after Bradt's first mention of the evidence, the judge instructed the jury to disregard the evidence of the negative polygraph, and also stated that he had decided to exclude the evidence and that the evidence "has no bearing on the case." Further, at a hearing on the contempt issue, Munier testified that she was never told about the motion in limine:

Q. (Mr. Barker): Ms. Munier, you were called as a witness in this case by the plaintiff, were you not?

A. That's correct.

Q. At any time before you were called to the stand in this case, were you ever apprised by any attorney representing the plaintiff about the existence of the Court's rulings on a motion in limine in this case?

A. No, I was not.

Q. I hand to you ... a file copy of defendants' joint motion in limine. Would you glance at that document and see if you were ever aware that that document had been filed or those motions had been made to the Court?

A. No, I've never seen this document or been told of its existence.

. . . . .

A. I had no knowledge of the limine regarding the polygraph.

The defense attorneys moved Judge West to hold Bradt in contempt. On April 10,

1992, the judge did so. The contempt order imposes punishment of (1) a $500 fine to be paid on April 13, 1992, and (2) confinement for 30 days. The order states that the confinement portion of the punishment is "suspended until the conclusion of the evidence" in the trial. Judge West further ruled that, at the conclusion of the evidence, he would consider whether to suspend the confinement portion of the contempt order again. Bradt timely paid the fine.

After hearing the rest of Metzger's evidence, Judge West granted a directed verdict to all defendants on all applicable causes of action. Judge West then sanctioned Metzger and his trial attorneys, Bradt and Izen. The judge signed a final judgment on May 21, 1992.

On June 16, 1992, Bradt filed a motion styled "Motion for New Trial And Motion To Recuse Judge West From Ruling On The Motion For New Trial." The motion states that "the judge should recuse himself from any further proceedings in this case, including ruling on the motion for new trial." On July 1, 1992, Judge West signed an order stating that he refused to recuse himself, and asked the presiding judge of his administrative judicial region to assign another judge to hear the motion to recuse.

On August 18, 1992, Judge West signed an order directing Bradt to show cause why he should not be held in contempt for his conduct on April 10 concerning the negative polygraph. Bradt moved for the determination of guilt or innocence of contempt by a judge other than the one who had held him in contempt. *See* TEX. GOV'T CODE ANN. § 21.002(d) (Vernon Supp.1994). The presiding judge of the administrative judicial region assigned another judge to determine Bradt's guilt or innocence. *See id.* The assigned judge dismissed the contempt charges that resulted from Bradt's conduct on April 10. Bradt was reimbursed the fine he had paid. He was never confined.

**5.** Metzger had no claim as a matter of law for negligent infliction of emotion distress, *see id.* at

### C. The appeal

Metzger, Bradt, and Izen appealed. We affirmed the directed verdict, affirmed the imposition of sanctions against Metzger but reversed and remanded for a new determination regarding the amount of sanctions, reversed and remanded the sanctions against Bradt, reversed the sanctions against Izen and rendered judgment that he not be sanctioned, and dismissed the portion of the appeal in which Bradt complained of being held in contempt, holding that we had no jurisdiction in the matter. *See Metzger v. Sebek*, 892 S.W.2d 20 (Tex.App.—Houston [1st Dist.], 1994, n.w.h.). We affirmed the directed verdict on all of Metzger's claims because (1) some were not viable to begin with,[5] and (2) there was no evidence to support the ones that were viable. *See id.*, at 41–48. In dismissing for want of jurisdiction the portion of the appeal in which Bradt complained of being held in contempt, we relied on a long line of Texas cases that holds that decisions in contempt proceedings are not appealable. *See id.*, at 54 (citing *Ex parte Williams*, 690 S.W.2d 243 n. 1 (Tex.1985); *Ex parte Cardwell*, 416 S.W.2d 382, 384 (Tex.1967); *Mendez v. Attorney Gen. of Texas*, 761 S.W.2d 519, 521 (Tex.App.—Corpus Christi 1988, no writ); *Smith v. Holder*, 756 S.W.2d 9, 10–11 (Tex.App.—El Paso 1988, no writ); *Gensco, Inc. v. Thomas*, 609 S.W.2d 650, 651 (Tex. Civ.App.—San Antonio 1980, no writ); *Anderson v. Burleson*, 583 S.W.2d 467 (Tex. Civ.App.—Houston [1st Dist.] 1979, no writ)).

### 3. Lawsuit number three: Metzger returns to federal court

Soon after Judge West held Bradt in contempt, Metzger filed a civil rights action in federal court against Sebek, Judge West, the attorneys for the defendants in lawsuit number two, the court reporter who transcribed the trial of lawsuit number two, and William Delmore III, the prosecutor who prosecuted the contempt charge. The federal court dismissed the case and ordered Metzger to pay the attorney's fees and costs incurred by West and Delmore.

41, or for medical negligence, *see id.* at 41.

### 4. Lawsuit number four: Bradt's lawsuit

The fourth lawsuit to emerge from the divorce case is the one at issue in this appeal. On October 8, 1993, Bradt sued the appellees for alleged conduct relating to his being held in contempt on April 10, 1992. He pled the following causes of action: (1) conspiracy to maliciously prosecute; (2) malicious prosecution; (3) intentional infliction of emotional distress; (4) tortious interference with contractual relations; and (5) "liab[ility] ... for actual damages ... under the Texas Torts [sic] Claims Act." [6] Bradt asserted the latter cause of action against only appellees West and Delmore.

The trial court granted summary judgment to all appellees on all applicable causes of action, the last such motion being granted on January 24, 1994. None of the summary judgment orders specify a particular ground on which summary judgment is granted.

## II. The Standard of Review

One of the purposes of summary judgment is to eliminate patently unmeritorious claims. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). A defendant who seeks summary judgment must prove conclusively that the plaintiff cannot prevail. *Griffin v. Rowden*, 654 S.W.2d 435, 436 (Tex. 1983); *Jaime v. St. Joseph Hosp. Found.*, 853 S.W.2d 604, 607 (Tex.App.—Houston [1st Dist.] 1993, no writ). Below, we address three grounds on which summary judgment for a defendant is proper, and set out the guidelines for our review of a summary judgment.

### 1. The negation of an element of the plaintiff's cause of action

A defendant can prove conclusively that the plaintiff cannot prevail by showing that at least one element of the plaintiff's cause of action has been conclusively established against him. *Gray v. Bertrand*, 723 S.W.2d 957, 958 (Tex.1987); *Jaime*, 853 S.W.2d at 607. A matter is "conclusively established" for summary judgment purposes if ordinary minds cannot differ regarding the conclusion to be drawn from the evidence. *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 657–58 (Tex.App.—Dallas 1992, no writ) (citing *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982)).

When the defendant has produced competent evidence negating a necessary element of the plaintiff's cause of action, the plaintiff, to avoid summary judgment, must then introduce evidence that raises a fact issue on the element the defendant is trying to negate. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107–108 (Tex.1984); *Jaime*, 853 S.W.2d at 607. If the plaintiff fails to introduce such evidence, i.e., if the summary judgment evidence establishes that there is no genuine issue of material fact, then summary judgment is proper. *Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex.1993); *Enchanted Estates Community Ass'n v. Timberlake Improvement Dist.*, 832 S.W.2d 800, 801 (Tex. App.—Houston [1st Dist.] 1992, no writ).

### 2. The lack of a cause of action

If the plaintiff's petition affirmatively demonstrates that no cause of action exists or that the plaintiff's recovery is barred, no opportunity to amend is necessary, and summary judgment or dismissal is proper. *Peek v. Equipment Serv. Co.*, 779 S.W.2d 802, 805 (Tex.1989). Summary judgment is proper where the plaintiff's allegations cannot constitute a cause of action as a matter of law. *Cockrell v. Republic Mortgage Ins. Co.*, 817 S.W.2d 106, 116 (Tex. App.—Dallas 1991, no writ) (citing *Lumpkin v. H & C Communications, Inc.*, 755 S.W.2d 538 (Tex.App.—Houston [1st Dist.] 1988, writ denied)).

### 3. Proof of an affirmative defense

A party that relies on an affirmative defense must specifically plead the defense, and, when the rules of civil procedure require, must verify the pleading by affidavit. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494 (Tex.1991). The properly pled affirmative defense, when supported by uncontroverted summary judgment evidence,

---

**6.** Tex.Civ.Prac & Rem.Code Ann. §§ 101.001–.109 (Vernon 1986 & Supp.1994).

may serve as a basis for summary judgment. *Id.*; *Albright v. Texas Dept. of Human Servs.*, 859 S.W.2d 575, 578 (Tex.App.—Houston [1st Dist] 1993, no writ). Even an unpled affirmative defense may serve as a basis for summary judgment when it is raised in the motion for summary judgment and the opposing party does not object to the lack of pleading either in a written response to the motion for summary judgment or before the rendition of judgment. *Roark*, 813 S.W.2d at 494.

▄▄ Whether the affirmative defense is pled or unpled, the defendant must conclusively establish all of the essential elements of the affirmative defense to be entitled to summary judgment. *Roark*, 813 S.W.2d at 495; *Rose v. Baker & Botts*, 816 S.W.2d 805, 809 (Tex.App.—Houston [1st Dist.] 1991, writ denied). If the defendant does so, the plaintiff, to avoid summary judgment, must then introduce evidence that raises a fact issue on some element of the defendant's affirmative defense. *Albright*, 859 S.W.2d at 578; *Poncar v. City of Mission*, 797 S.W.2d 236, 240 (Tex.App.—Corpus Christi 1990, no writ).

### 4. Appellate review of a summary judgment

▄▄ On appellate review of a summary judgment, we must take all evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549 (Tex. 1985); *Jaime*, 853 S.W.2d at 607. We will not affirm a summary judgment on a ground that was not specifically presented in the motion for summary judgment. *Travis v. City of Mesquite*, 830 S.W.2d 94, 100 (Tex. 1992); *Bill De La Garza & Assocs., P.C. v. Dean & Ongert*, 851 S.W.2d 371, 373 (Tex. App.—Houston [1st Dist.] 1993, no writ). Nor will we reverse a summary judgment on a ground that was not expressly presented to the trial court by a written motion, answer, or other response to the motion for summary judgment. *Travis*, 830 S.W.2d at 99–100;

Universal Savings Ass'n v. Killeen Savings & Loan Ass'n, 757 S.W.2d 72, 75 (Tex.App.—Houston [1st Dist.] 1988, no writ); *see Manoogian v. Lake Forest Corp.*, 652 S.W.2d 816, 819 (Tex.App.—Austin 1983, writ ref'd n.r.e.). Further, we will not reverse a summary judgment on a ground that was expressly presented to the trial court by a written motion, answer, or other response to the motion for summary judgment, but that was subsequently abandoned by the nonmovant. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). When the trial court's summary judgment order does not specify the ground or grounds on which summary judgment is granted, we will affirm the summary judgment if any of the grounds stated in the motion are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989); *Jaime*, 853 S.W.2d at 608.

### III. The Summary Judgment in Favor of West

In their fourth point of error, the appellants contend that the trial court erred in granting summary judgment to Judge West. West moved for summary judgment on the ground of absolute immunity.[7]

According to the appellants, "West was not sued for his conduct on April 10, 1992, wherein he signed an order of contempt against L.T. Bradt. West was sued for his conduct after he refused to recuse himself in [lawsuit number two]...." Specifically, the appellants complain of "the ex parte contact with Nancy Locke and the signing of a show cause order on August 18, 1992—when [West] was devoid of any jurisdiction to act in [lawsuit number two]." We must determine whether West has absolute judicial immunity from being sued for the acts of which the appellants complain in their pleadings.

▄▄ The judges of Texas courts have absolute immunity for their judicial acts "unless such acts fall clearly outside the judge's subject-matter jurisdiction." *Spencer v. City of Seagoville*, 700 S.W.2d 953, 957–58 (Tex. App.—Dallas 1985, no writ); *see Holloway v.*

---

7. Immunity is an affirmative defense. *See Poncar*, 797 S.W.2d at 239. West pled the affirmative defense of absolute immunity.

*Walker,* 765 F.2d 517, 523 (5th Cir.), *cert. denied,* 474 U.S. 1037, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985); *Adams v. McIlhany,* 764 F.2d 294, 297 (5th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986). Thus, in determining whether absolute judicial immunity applies, we face a two-part inquiry: First, were the acts of which the appellants complain "judicial" ones? Second, were those acts "clearly outside" the judge's jurisdiction?

Before turning to the first question, we note that no improper ex parte contacts occurred in lawsuit number two, a conclusion we also reached in *Metzger v. Sebek. See* 892 S.W.2d at 50. Here, the same assertion is made under a record that consists in part of different materials. This record, too, fails to show any improper ex parte contacts. Thus, we are left with the signing of the show-cause order on August 18, 1992.

### 1. Was West's act a "judicial" one?

▇▇▇ The factors we consider in determining whether a judge's act is a "judicial" one are (1) whether the act complained of is one normally performed by a judge, (2) whether the act occurred in the courtroom or an appropriate adjunct such as the judge's chambers, (3) whether the controversy centered around a case pending before the judge, and (4) whether the act arose out of a visit to the judge in his judicial capacity. *Malina v. Gonzales,* 994 F.2d 1121, 1124 (5th Cir.1993) (citing *McAlester v. Brown,* 469 F.2d 1280, 1282 (5th Cir.1972)); *Adams,* 764 F.2d at 297 (also citing *McAlester,* 469 F.2d at 1282). These factors should be broadly construed in favor of immunity. *Malina,* 994 F.2d at 1124; *Adams,* 764 F.2d at 297. Not all of the factors must be met for immunity to exist. *Malina,* 994 F.2d at 1124; *Harris v. Deveaux,* 780 F.2d 911, 915 (11th Cir. 1986); *Adams,* 764 F.2d at 297. In some circumstances, immunity may exist even if three of the four factors are not met. *Adams,* 764 F.2d at 297 n. 2. Nor are the factors to be given equal weight in all cases;

rather, they should be weighted according to the facts of the particular case. *Id.* at 297.

▇▇▇ *Adams* is on point in regard to the first factor. The issuance of a show-cause order directing someone to show cause why he should not be held in contempt for his conduct is an act normally performed by a judge. 764 F.2d at 297, 298. The second factor is unimportant here, where the act complained of is the signing of an order. Where Judge West actually was when he signed the order is irrelevant; an order signed by a judge somewhere other than in his courtroom or chambers is as valid as it would have been had he signed it at the bench.

The third and fourth factors are easily met on this record. The controversy clearly centered around a case pending before the judge (lawsuit number two). The act arose out of a "visit" to the judge in his judicial capacity: the judge signed the show-cause order (the signing is the "act") based on Bradt's conduct during the trial of lawsuit number two (in which Bradt, in representing the plaintiff, was before the judge—thus "visiting" him— who was acting in his judicial capacity in presiding over the trial).[8]

We answer the first question in the affirmative. West's act was a judicial one.

### 2. Was West's act "clearly outside" his jurisdiction?

The appellants argue that when West signed the show-cause order on August 18, 1992, "West was without any jurisdiction to act...." According to the appellants, West lacked jurisdiction because, on June 16, 1992, well before he signed the show-cause order, he had been presented with a timely motion to recuse in lawsuit number two, and so should have either recused himself or asked the presiding judge of the administrative judicial district to assign a judge to hear the motion. This argument misses the point.

The term "jurisdiction" has a connotation in judicial immunity analyses that is entirely different from its usual meaning. *Adams,*

---

8. The *"McAlester* visit" factor may be applied loosely. *See Adams,* 764 F.2d at 298. Here, however, it need not be. Representing a party in a trial is most certainly a "visit" to the judge presiding over the trial as that term is used in determining immunity.

764 F.2d at 298. "Where a court has some subject-matter jurisdiction, there is sufficient jurisdiction for immunity purposes." *Malina*, 994 F.2d at 1125; *Adams*, 764 F.2d at 298; *accord Harris*, 780 F.2d at 916 (holding that a judge acts in the "clear absence of all jurisdiction" only if the judge "completely lacks subject matter jurisdiction"). Furthermore, "the term 'jurisdiction' is to be broadly construed to effectuate the policies of guaranteeing a disinterested and independent judicial decision-making process." *Holloway*, 765 F.2d at 523; *accord Stump v. Sparkman*, 435 U.S. 349, 356, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978).

▮▮ In determining whether an act was clearly outside a judge's jurisdiction for judicial immunity purposes, the focus is not on whether the judge's specific act was proper or improper, but on whether the judge had the jurisdiction necessary to perform an act of that kind in the case. *See Mireles v. Waco*, 502 U.S. 9, 13, 112 S.Ct. 286, 289, 116 L.Ed.2d 9 (1991) (where judge was alleged to have authorized and ratified police officers' use of excessive force in bringing recalcitrant attorney to judge's courtroom, and thus to have acted in excess of his authority, his alleged actions were still not committed in the absence of jurisdiction where he had jurisdiction to secure attorney's presence before him); *Malina*, 994 F.2d at 1124 (because judge had power to cite for contempt and to sentence, where judge cited motorist for contempt and sentenced him to jail, these acts were within his jurisdiction, even though judge had acted improperly in stopping the motorist himself, privately using an officer to unofficially "summon" the motorist to court, and charging the motorist himself); *Sindram v. Suda*, 986 F.2d 1459, 1460 (D.C.Cir.1993) (judge's prohibiting plaintiff from filing any new civil actions pro se before paying outstanding sanctions was "well within" judge's "jurisdiction" as term is used for judicial immunity test); *Holloway,* 765 F.2d at 523 (where judge was alleged to have committed many illegal acts from the bench, but there was "no question that he was generally empowered to conduct proceedings of the sort he [was] conduct[ing]" at the time he allegedly committed the illegal acts, the acts were within his jurisdiction for judicial immunity

purposes). Even the commission of "grave procedural errors" does not deprive a judge of jurisdiction as the term is meant in absolute judicial immunity analyses. *Stump*, 435 U.S. at 359, 98 S.Ct. at 1106; *Malina*, 994 F.2d at 1125.

▮▮ Thus, the question is not whether West acted improperly when he signed the specific order complained of, but whether he had the jurisdiction necessary to sign an order of that kind, i.e., a show-cause order, in the case. He clearly did. Signing a show-cause order—even a void one—in a case before him is an act within a district judge's "jurisdiction," as that term is used for judicial immunity purposes. Therefore, regardless of the motion to recuse, West acted within his "jurisdiction," *as that term is used in judicial immunity analyses*, when he signed the show-cause order. We answer the second question, too, in the affirmative.

▮▮ The appellants argue that West "was [also] sued for his conduct ... [in] joining the conspiracy to maliciously prosecute Bradt...." This contention does not aid the appellants. "The fact that it is alleged that the judge acted pursuant to a conspiracy ... is not sufficient to avoid absolute judicial immunity." *Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir.1991).

Furthermore, the appellants have waived any cause of action for conspiracy to maliciously prosecute. The appellants pled this cause of action, and all of the appellees received summary judgment on it, but on appeal the appellants do not adequately complain of the summary judgments on this particular cause of action. In their brief, the appellants do not discuss the facts relevant to a cause of action for conspiracy sufficiently to maintain a complaint that the court should not have granted summary judgment on that cause of action. The appellants do mention the alleged conspiracy a few times in the brief, but in general, conclusory terms, such as "Judge West joined in the conspiracy to maliciously prosecute L.T. Bradt for contempt." These statements are not a discussion of the facts as contemplated by TEX. R.APP.P. 74(f)(2); they do not amount to "such discussion of the facts ... as may be

requisite to maintain the point at issue." There is no such discussion in the appellants' brief. This violation of rule 74(f)(2) waives any contention that the trial court erred in granting judgment for the appellees on this cause of action.

■ In their motion for rehearing, the appellants point out that their brief contains authorities on conspiracy. While true, authorities alone are not sufficient to comprise an "argument" that suffices under rule 74(f)(2), just as a discussion of the facts, without authorities, is not a sufficient "argument" under that rule. Rule 74(f)(2) plainly requires *both*. Each violation of rule 74(f)(2) is a separate, independent ground of waiver of the contention. Here, the contention that the trial court erred in granting judgment for the appellees on this cause of action is waived by the appellants' failure to adequately discuss the facts.

### 3. Conclusion regarding West

Judge West has absolute judicial immunity from being sued for the acts of which the appellants complain. "[J]udicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles*, 502 U.S. at 11, 112 S.Ct. at 288. Therefore, it makes no difference what specific causes of action the appellants brought against West; he is immune from being sued at all. *See id.*

■ Despite the unfairness to litigants that sometimes results, the existence of the doctrine of judicial immunity is in the best interests of justice. *Stump*, 435 U.S. at 363, 98 S.Ct. at 1108. It allows a judge, in exercising the authority vested in him, to be free to act according to his best judgment, unencumbered by anxiety about being sued for acts he performs in discharging his duties. *Id.* The public has a right to expect the unfettered execution of those duties; this doctrine helps the judge fulfill those expectations. Thus, absolute judicial immunity "should not be denied where the denial carries the potential of raising more than a frivolous concern in a judge's mind that to take proper action might expose him to personal liability." *Malina*, 994 F.2d at 1124;

*accord Adams*, 764 F.2d at 297. "The fact that the issue before the judge is a controversial one is all the more reason that he should be able to act without fear of suit." *Stump*, 435 U.S. at 364, 98 S.Ct. at 1108.

We overrule the appellants' fourth point of error and affirm the summary judgment granted to Judge West.

### IV. The Summary Judgment in Favor of Delmore

In their fifth point of error, the appellants argue that the trial court erred in granting summary judgment to William Delmore. Delmore moved for summary judgment on the grounds of absolute immunity and qualified immunity.[9]

In *Font v. Carr*, 867 S.W.2d 873, 878 (Tex. App.—Houston [1st Dist.] 1993, writ pending), this Court, following the lead of the Supreme Court in *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991), applied the "functional approach" to the issue of absolute prosecutorial immunity. This approach focuses on the nature of the official acts of which the plaintiff complains. *DeCamp v. Douglas County Franklin Grand Jury*, 978 F.2d 1047, 1053 (8th Cir.1992), *cert. denied*, — U.S. — – —, 113 S.Ct. 3036–3037, 125 L.Ed.2d 723 (1993); *see Burns*, 500 U.S. at 487–92, 111 S.Ct. at 1940–42.

The appellants sued Delmore for prosecuting the contempt proceeding against Bradt. Their first reason that Delmore should not have proceeded with the prosecution is that he "act[ed] on a void charging instrument"— void because the show-cause order was signed after Bradt had filed his June 16, 1992, motion to recuse Judge West. The appellants' second reason that Delmore should not have proceeded with the prosecution is that he allegedly had "no jurisdiction or authority" to prosecute the contempt proceeding.

■ Regardless of the specific reasons that the appellants contend Delmore should not have prosecuted, their complaint is that he should not have prosecuted. The act of

9. Delmore pled both of these affirmative defenses.

which the appellants complain—a prosecution in a state court—is the quintessential function of a prosecutor like Delmore. It is an act that is intimately associated with the judicial phase of the criminal process. *Enlow v. Tishomingo County,* 962 F.2d 501, 511 (5th Cir.1992); *Kadivar v. Stone,* 804 F.2d 635, 637 (11th Cir.1986). Under the functional approach, a prosecutor's acts that are "intimately associated with the judicial phase of the criminal process" are protected by absolute immunity. *DeCamp,* 978 F.2d at 1053; *see Burns,* 500 U.S. at 492, 111 S.Ct. at 1942; *Kadivar,* 804 F.2d at 637. We therefore hold that Delmore is absolutely immune from being sued for the acts of which the appellants complain.

Even if Delmore proceeded under a "void charging instrument" and had "no jurisdiction or authority" to prosecute the contempt proceeding—questions we need not decide—these facts would not deprive him of absolute immunity in this case. We recognize that "a prosecutor might lose absolute immunity when he acts with a complete and clear absence of authority...." *Snell v. Tunnell,* 920 F.2d 673, 694 (10th Cir.1990), *cert. denied, Swepston v. Tunnell,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991); *accord Haynesworth v. Miller,* 820 F.2d 1245, 1265 (D.C.Cir.1987). However, the focus of the inquiry into whether a prosecutor had the "authority" to perform the act of which the plaintiff complains—like the focus of the "jurisdiction" element of the test for judicial immunity[10]—is not on the propriety or impropriety of the defendant's specific act. Rather, the focus is on whether the prosecutor had the authority to perform an act of that kind. *See Haynesworth,* 820 F.2d at 1265 (where plaintiff alleged that state official established and implemented policy of retaliatory prosecution, and official had the authority to establish and implement policies governing criminal prosecutions, official's alleged actions were actions within his authority). The act of which the appellants complain is one that Delmore had the authority to effect.

Our conclusion under the "functional approach" is supported by the case law in whose wake we write. At least three courts have held that Texas prosecutors enjoy absolute immunity in initiating prosecutions and presenting the State's case. *See Kimmel v. Leoffler,* 791 S.W.2d 648, 651 (Tex.App.—San Antonio 1990, writ denied) (per curiam); *Dayse v. Schuldt,* 894 F.2d 170, 172 (5th Cir.1990); *Keeble v. Cisneros,* 664 F.Supp. 1076, 1078 (S.D.Tex.1987). Our conclusion also promotes public policy considerations that undergird the concept of absolute prosecutorial immunity:

> First, forcing a prosecutor to answer in a civil lawsuit for his decision to initiate and pursue a prosecution could skew his decisionmaking, tempting him to consider the personal ramifications of his decision rather than rest that decision purely on appropriate concerns. Further, prosecutors haled into court to defend their decisions would, even if they prevailed on the merits, have had their energies diverted from their important duty of enforcing the criminal law. Lastly, because the prosecutor may be responsible annually for hundreds of indictments and trials, and because so many of these decisions to prosecute could engender colorable claims of constitutional deprivation, forcing him to defend these decisions could impose intolerable burdens. Thus, it has long been established that even where the prosecution has so little merit that a verdict is directed in favor of the defendant "upon the prosecutions's evidence," the decision to prosecute is protected by absolute immunity.

*Schloss v. Bouse,* 876 F.2d 287, 289–90 (2d Cir.1989) (citations omitted).

Absolute immunity is "strong medicine." *Snell,* 920 F.2d at 696. We are cognizant of the "presumption [ ] that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns,* 500 U.S. at 486–487, 111 S.Ct. at 1939. Some facts, however, compel a finding of absolute prosecutorial immunity. *See, e.g., id.* at 492, 111 S.Ct. at

---

**10.** At least one court has noted that the test for whether a prosecutor acted outside his authority is analogous to the "jurisdiction" element of the test for judicial immunity. *See Snell,* 920 F.2d at 694.

1942 (holding that prosecutor's "appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing are protected by absolute immunity"); *Newcomb v. Ingle,* 944 F.2d 1534, 1536 (10th Cir.1991) (holding that prosecutor is absolutely immune from claim arising from decision not to prosecute and from claim arising from "actions taken prior to deciding not to prosecute, such as reviewing and evaluating [ ] tapes"), *cert. denied,* 502 U.S. 1044, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992); *Schloss,* 876 F.2d at 293 (holding that prosecutor "is entitled to absolute immunity in a suit for damages challenging his demand for a release in exchange for a decision not to prosecute"); *Russell v. Millsap,* 781 F.2d 381, 383 (5th Cir.1985) (holding that Texas prosecutors were absolutely immune from claim arising from their role in obtaining state court injunction that "restrain[ed] massage parlor and prostitution activities which violated Texas law"), *cert. denied,* 479 U.S. 826, 107 S.Ct. 103, 93 L.Ed.2d 53 (1986). This case belongs in the same category.

Delmore is absolutely immune from being sued for the acts of which the appellants complain. The absolute immunity protects him from a civil suit for damages. *Hunt v. Jaglowski,* 926 F.2d 689, 692 (7th Cir.1991) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)). Therefore, it makes no difference what specific causes of action the appellants brought against Delmore; he is immune from being sued for damages. *See Hunt,* 926 F.2d at 692.

Because Delmore is absolutely immune, we do not consider whether qualified immunity applies. *See Snell,* 920 F.2d at 696 (court proceeded to determine whether prosecutor was entitled to qualified immunity only after first determining she was not entitled to absolute immunity). We overrule the appellants' fifth point of error and affirm the summary judgment granted to Delmore.

### V. The Summary Judgment in Favor of the "Attorney–Appellees"

In their first point of error, the appellants contend that the trial court erred in granting summary judgment to the "attorney-appel-lees," who are Earle Lilly, Piro & Lilly, P.C., Joel Nass, Edward J. Hennessy, Hennessy & Zito, Donald B. McFall, McFall & Sartwelle, P.C., Alan Magenheim, Hirsch, Glover, Robinson & Sheiness, P.C., William R. Pakalka, Nancy Locke, Fulbright & Jaworski, Donald M. Hudgins, Hudgins, Hudgins & Warrick, P.C., James H. Barker, Giessel, Stone, Barker & Lyman, P.C., Sheryl Mulliken Fike, R. Edward Perkins, John Kapacinskas, Wade Quinn, Matt Shafer, and Dean Barth. As indicated above, these are the attorneys and firms who represented the defendants in lawsuit number two.

The attorney-appellees moved for summary judgment on the ground (among others) that the appellants have no right of recovery against them for their conduct in lawsuit number two. We agree with the attorney-appellees.

■ The public has an interest in "loyal, faithful and aggressive representation by the legal profession...." *Maynard v. Cabellero,* 752 S.W.2d 719, 721 (Tex.App.—El Paso 1988, writ denied). An attorney is thus charged with the duty of zealously representing his clients within the bounds of the law. *Id.* In fulfilling this duty, an attorney "ha[s] the right to interpose any defense or supposed defense and make use of any right in behalf of such client or clients as [the attorney] deem[s] proper and necessary, without making himself subject to liability in damages...." *Morris v. Bailey,* 398 S.W.2d 946, 947 (Tex.Civ.App.—Austin 1966, writ ref'd n.r.e.); *accord Likover v. Sunflower Terrace II, Ltd.,* 696 S.W.2d 468, 472 (Tex.App.—Houston [1st Dist.] 1985, no writ). Any other rule

would act as a severe and crippling deterrent to the ends of justice for the reason that a litigant might be denied a full development of his case if his attorney were subject to the threat of liability for defending his client's position to the best and fullest extent allowed by law, and availing his client of all rights to which he is entitled.

*Morris,* 398 S.W.2d at 947–48.

■ Adhering to these principles, we hold that an attorney does not have a right of

recovery, under any cause of action, against another attorney arising from conduct the second attorney engaged in as part of the discharge of his duties in representing a party in a lawsuit in which the first attorney also represented a party. An attorney should not go into court knowing that he may be sued by the other side's attorney for something he does in the course of representing his client; such a policy would favor *tentative* representation, not the *zealous* representation that our profession rightly regards as an ideal and that the public has a right to expect. That policy would dilute the vigor with which Texas attorneys represent their clients, which would not be in the best interests of justice.

■ The rule stated above focuses on the kind of conduct engaged in, not on whether the conduct was meritorious in the context of the underlying lawsuit. For example, an attorney would have no right of recovery against the second attorney for the second attorney's having made certain motions in the underlying lawsuit, regardless of whether the motions were meritless or even frivolous, because making motions is conduct an attorney engages in as part of the discharge of his duties in representing a party in a lawsuit. This is not to say, however, that an attorney cannot be punished for conduct he engaged in as part of the discharge of his duties in representing a party in a lawsuit when that conduct is wrongful. The law provides for the punishment of such acts. *See, e.g.,* TEX. R.CIV.P. 13 (power to punish attorney for filing improper pleadings, motions, and "other papers"); TEX.R.CIV.P. 215 (power to punish attorney for abusing discovery); TEX. GOV'T CODE ANN. § 21.002 (Vernon 1988) (power to punish attorney for contempt of court). But the law does not provide a cause of action to the attorney on the other side for the performance of such acts.

Bradt violated the court's order on the attorney-appellees' motion in limine on three occasions. He violated it when he failed to advise Marie Munier, before she took the stand, of the contents of the granted portions of the motion in limine, whereupon she mentioned the negative polygraph in response to one of his questions; he violated it when he mentioned the negative polygraph right after Munier did; and he violated it when, despite the judge's words after the preceding occasion, he mentioned the negative polygraph yet again. The attorney-appellees, upon hearing Bradt's second mention of the negative polygraph, and thus witnessing what was to them at the time the second violation of the court's order on their motion in limine,[11] moved the court to hold Bradt in contempt. This was nothing more than attorneys, as part of the discharge of their duties in representing a party in a lawsuit, fervently attempting to protect their clients' right to a fair and proper trial. This conduct should not be actionable. An attorney clearly has the right to ask the court to hold an attorney for the other side in contempt when the other side's attorney has violated a court order. This is particularly true where the other side's attorney's misconduct has jeopardized a right of the first attorney's client.

■ The appellants argue that attorneys should not be able to "inflict indiscriminate damage" merely because they are attorneys representing parties. Our holding will give no such license. To use one of the appellants' hypotheticals, had one of the attorney-appellees physically assaulted Bradt during the trial of lawsuit number two, that attorney-appellee's conduct would not be protected by our holding, because such conduct would not be part of the discharge of the attorney-appellee's duties in representing a party in the lawsuit. Assaulting the opposing attorney is not part of the discharge of an attorney's duties in representing a party.

The appellants also contend that the attorney-appellees' motion for contempt was necessarily outside the discharge of the attorney-appellees' duties in representing the client-appellees because the attorney-appellees knew that Bradt

> could not be held in contempt for referring to the polygraph test in violation of the Order in Limine—because the Order in

---

11. Although Bradt's second mention of the negative polygraph was actually his third violation, the fact of the first violation did not become certain until Munier testified that none of the plaintiff's counsel had advised her of the court's ruling on the attorney-appellees' motion in limine. Thus, to the attorney-appellees, Bradt's second mention of the negative polygraph was only the second violation at the time it occurred.

Limine did not order L.T. Bradt not to refer to the results of the polygraph test, nor did it order L.T. Bradt to perform any act nor to refrain from performing any act. This Order was simply incapable of being violated.

We find this argument disingenuous at best.

Before the trial of lawsuit number two commenced, Judge West granted the defendants' motion in limine. The document styled "Order on Defendants' Joint Motion in Limine" states that "The Court has considered the Motion in Limine filed by defendants ... and rules as follows." The order then splits into three columns, as shown:

I. GRANTED ——————— DENIED ——————
II. GRANTED ——————— DENIED ——————

The order continues in this fashion until the last Roman numeral, XXXIII. It then reflects the date of signature and the signature of the judge. Each Roman numeral corresponds to a section of the motion in which the defendants sought to exclude potential evidence. For example, in section XVI of their motion in limine, the defendants sought to exclude potential evidence regarding the polygraph test. The court's order corresponds like this:

XVI. GRANTED [check mark] DENIED ——————

While the order *itself* does not order Bradt to refrain from performing any act, it is too obvious for credible dispute that a trial attorney who reads the order should understand that it refers to corresponding sections of the attached and incorporated defendants' motion in limine and informs the attorney of the court's ruling regarding the corresponding sections.

This is the standard, accepted way of producing an order on a motion in limine. It is also entirely sensible. It prevents the attorneys and the trial court from having to produce a court document that would merely repeat much of the substance of an often-lengthy document that is already before the court: the motion in limine. This logical method saves time and the needless creation of still more court papers. Furthermore, Bradt testified at the contempt hearing that he was served with a copy of the defendants' motion in limine; that he was present in the courtroom when the judge ordered that the polygraph examination not be discussed or referred to by anybody before first approaching the bench; that he felt "bound" by the court's order; and that he felt "bound" by the court's order to discuss the contents of the motion in limine with all of his witnesses before calling them to the stand so they would not unknowingly violate the court's order on the motion in limine.

The foundation for the appellants' argument is faulty; the order on the defendants' motion in limine was capable of being violated, and Bradt violated it. The attorney-appellees were justified in moving for contempt.

 Furthermore, an attorney does not owe a duty to the attorney on the other side to ultimately be correct in his legal arguments; even if the attorney-appellees' motion for contempt had been meritless, their conduct in so moving, coming as it did in the discharge of their duties in representing a party in a lawsuit, would still not be actionable.

The appellants also argue that the attorney-appellees' motion for contempt was necessarily outside the discharge of their duties in representing the client-appellees because "it simply cannot be a contemptuous act to refer to a document which has been previously admitted into evidence, for all purposes

and without objection...."[12] This argument presumes that once a judge unconditionally admits an exhibit into evidence, he can never subsequently restrict the presentation of certain of its contents to the jury. This is not, and should not be, the law. If it was, a judge who had erroneously unconditionally admitted an exhibit could never right his wrong by subsequently prohibiting a party from presenting to the jury those of its contents that are inadmissible, even on proper motion of one of the parties. We know of no authority—and the appellants cite none—that would have prevented Judge West, after admitting the exhibit that contained the polygraph results, from restricting the presentation of the polygraph results themselves to the jury by an order on a motion in limine.

In any event, that the exhibit containing the polygraph results had been previously admitted, and the terms of the exhibit's admission, are irrelevant. Regardless of the circumstances of the admission of the exhibit that contained the polygraph results, Bradt was still bound to obey the terms of the court's subsequent order on the motion in limine. Even if we were to assume that the court's order on the defendants' motion in limine was erroneous because the results had been admitted previously, we are still left with the rule that an attorney is in peril of contempt when he disobeys a court's order, even if the order was an erroneous one. See *Ex parte Fernandez*, 645 S.W.2d 636, 638 (Tex.App.—El Paso 1983, no writ).[13]

Thus, Bradt's conduct was contemptuous even if the court's order on the defendants' motion in limine was erroneous. Further, as noted, an attorney does not owe a duty to the attorney on the other side to ultimately be correct in his legal arguments; even if the attorney-appellees' motion for contempt had

been meritless, their conduct in so moving, coming as it did in the discharge of their duties in representing a party in a lawsuit, would still not be actionable.

The appellants also argue that the attorney-appellees failed to disprove with summary judgment evidence any of the elements of the appellants' cause of action of abuse of process. They contend that the attorney-appellees were therefore not entitled to summary judgment on this cause of action. For two independent reasons, we disagree.

First, the appellants did not plead the cause of action of abuse of process. The appellants' live petition is clear and specific in setting out their causes of action. The petition presents the causes of action with individual, bolded headings, followed by a discussion of the facts that allegedly support the particular cause of action. The headings are as follows:

**FIRST CAUSE OF ACTION—CONSPIRACY TO MALICIOUSLY PROSECUTE AND MALICIOUS PROSECUTION**

**SECOND CAUSE OF ACTION—INTENTIONAL INFLICTION OF MENTAL ANGUISH**

**THIRD CAUSE OF ACTION—TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

**ADDITIONAL GROUNDS OF LIABILITY**

Under the heading "ADDITIONAL GROUNDS OF LIABILITY," the appellants state:

In the alternative, but without waiving any of the foregoing, Plaintiffs would show that West and Delmore are state actors who used tangible personal property to injure the Plaintiffs, as described above. West

---

**12.** Before the commencement of trial, and before the court's ruling on the defendants' motion in limine, some exhibits were "preadmitted" for trial, i.e., admitted before trial so the proceedings before the jury would not be prolonged by the parties offering evidence whose admission could have been ruled on earlier. During this "preadmission," the sizable exhibit that contained the polygraph results was admitted. The polygraph results were not separately admitted into evidence at any time, nor separately offered into evidence at any time.

**13.** We are aware of the exception to the rule. If the court exceeded its jurisdiction in entering the order, the order is void, and will not support a contempt charge. *Id.; see McCullough v. McCullough*, 483 S.W.2d 869, 871 (Tex.Civ.App.—Tyler 1972, no writ) (holding that "a person may not be punished as for contempt for violating an order for which a court has no power to enter"). This exception clearly does not apply here.

and Delmore are thus liable to Plaintiffs for actual damages caused by their conduct under the Texas Torts [sic] Claim [sic] Act.

There is no heading entitled **"ABUSE OF PROCESS."** The words "abuse of process" do not appear in the petition. While neither a heading entitled "Abuse of Process" or the words "abuse of process" are required for the petition to sufficiently plead that cause of action, the petition does not refer to the cause of action even indirectly, and does not set forth facts that, if proven, would prove the elements of that cause of action.

▮▮▮ In deciding whether a pleading sufficiently sets out a particular cause of action, we determine whether the pleading gives fair and adequate notice to the pleader's adversary of the nature of the cause of action asserted against him. *Castleberry v. Goolsby Bldg. Corp.,* 617 S.W.2d 665, 666 (Tex.1981); *Ghazali v. Southland Corp.,* 669 S.W.2d 770, 775 (Tex.App.—San Antonio 1984, no writ); *see Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 186 (Tex.1977); *Lawyers Surety Corp. v. Royal Chevrolet, Inc.,* 847 S.W.2d 624, 627–28 (Tex.App.—Texarkana 1993, writ denied). The pleading must give the required notice so that the pleader's adversary can adequately prepare his defense. *Castleberry,* 617 S.W.2d at 666; *Lawyers Surety,* 847 S.W.2d at 627; *Ghazali,* 669 S.W.2d at 775. Guided by these principles, we hold that the appellants did not plead the cause of action of abuse of process.

We considered a similar situation in *Thompson v. Vinson & Elkins,* 859 S.W.2d 617 (Tex.App.—Houston [1st Dist.] 1993, writ denied). The plaintiffs in that case pled seven causes of action. *Id.* at 620. The trial court granted summary judgment on all seven. *Id.* at 618.

In their brief, the plaintiffs referred not only to the seven causes of action they indisputably had pled, but to two other causes of action, conspiracy and interference with inheritance rights, that they also allegedly brought against the defendant. 859 S.W.2d at 620–21. We wrote:

Nowhere in their [live] petition did the Thompsons allege that V & E engaged in a conspiracy. Their causes of action are individually set out in highlighted headings, in a specific, orderly fashion. Under each heading is a list of the defendants against whom the Thompsons are bringing that particular cause of action. There is no mention of conspiracy, regarding V & E or any other defendant. Conspiracy simply was not pled. This claim was not before the trial court, and, as such, the Thompsons' claim of conspiracy cannot be considered by this Court.

Nor did the Thompsons plead "interference in inheritance rights." We cannot consider this claim, either.

*Id.* at 621 (citations omitted).

▮▮▮ Even under our policy of construing petitions liberally in favor of the pleader when special exceptions are not filed,[14] the appellants have simply not pled the cause of action of abuse of process. "Liberal" does not mean "far-fetched"; the policy does not allow us to read into a petition a cause of action that was plainly omitted. The appellants just did not plead abuse of process.

The cause of action of abuse of process was not before the trial court. As such, we cannot consider it, either. *See Thompson,* 859 S.W.2d at 621.

The appellants argue that we must conclude that they pled the cause of action of abuse of process in their live petition because the appellees did not file special exceptions to the petition. We disagree.

▮▮▮ There is no duty to file special exceptions that in effect ask a plaintiff whether he wants to add a cause of action that he left out to the one(s) he has already pled. Under the appellants' argument, the attorney-appellees would have a duty to file special exceptions inquiring whether the appellants intended by their pleadings to bring the cause of action of violation of civil rights, the cause of action of RICO, and so on until they covered all causes of action that might arguably apply to the facts pled. This is not what

---

14. *See Roark v. Allen,* 633 S.W.2d 804, 809 (Tex. 1982); *Stone,* 554 S.W.2d at 186; *Lawyers Sure-* *ty,* 847 S.W.2d at 627.

special exceptions are for, and it is not the way our system of pleading works.

The second reason germane to abuse of process that we affirm the attorney-appellees' summary judgment is that our holding applies to *all* causes of action brought by an attorney against another attorney arising from conduct the second attorney engaged in as part of the discharge of his duties in representing a party in a lawsuit in which the first attorney also represented a party. Thus, the appellants would have no right of recovery in this case under any cause of action.

■ An attorney has no right of recovery, under any cause of action, against another attorney arising from conduct the second attorney engaged in as part of the discharge of his duties in representing a party in a lawsuit in which the first attorney also represented a party. We overrule point of error one and affirm the summary judgment granted to the attorney-appellees.[15]

### VI. The Summary Judgment in Favor of the "Client–Appellees"

In their second point of error, the appellants argue that the trial court erred in granting summary judgment to the "client-appellees," who are Judy Sebek, Foundation for Depelchin Children's Center, Baylor College of Medicine, Ernest Kendrick, M.D., Michael D. Cox, Jean Guez, Barbara Taylor Chase Hopkins, Luisa Maria Acevedo Lohner, and Ann M. Hodges. As indicated above, these were the defendants in lawsuit number two.

The client-appellees moved for summary judgment on the ground (among others) that they were not bound by the conduct of their attorneys in moving to hold Bradt in contempt. We agree with the client-appellees.

■ The appellants contend that the attorney-client relationship is one of agency. We agree with the appellants that this is the law. *See Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 693 (Tex.1986). Our agreement ends, however, at the point where the appellants argue that, merely because such an agency relationship existed in this case, the client-appellees are automatically liable for any tortious conduct on the part of their attorneys. The mere existence of an agency relationship is not enough to visit tort liability on a principal. *Graham v. McCord,* 384 S.W.2d 897, 898 (Tex.Civ.App.—San Antonio 1964, no writ); *see Miller v. Towne Servs., Inc.,* 665 S.W.2d 143, 145–46 (Tex.App.—Houston [1st Dist.] 1983, no writ) (holding that even though agency relationship existed, principal was not liable for tort of agent). Therefore, contrary to the appellants' argument, the mere fact that an agency relationship existed between the client-appellees and the attorney-appellees does not mean that the client-appellees would automatically be liable for any tortious conduct on the part of the attorney-appellees.

■ In the context of sanctions, a party to a civil suit cannot be liable for the intentional wrongful conduct of his attorney unless the client is implicated in some way other than merely having entrusted his legal representation to the attorney. *See Trans-American Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991); *Ogunboyejo v. Prudential Property & Casualty Co.,* 844 S.W.2d 860, 863 (Tex.App.—Texarkana 1992, writ denied); *Glass v. Glass,* 826 S.W.2d 683, 687–88 (Tex.App.—Texarkana 1992, writ denied). We hold that the same rule applies here. Unless a client is implicated in some way other than merely being represented by the attorney alleged to have committed the intentional wrongful conduct, the client cannot be liable for the attorney's conduct. A contrary holding would in effect obligate

---

**15.** Because we affirm the summary judgment granted to the attorney-appellees on the ground discussed above, we need not here discuss the other grounds on which they moved for summary judgment.

In their motion for rehearing, the appellants assert that, by our holding on this issue, we have "abrogat[ed] the cause of action for malicious prosecution." This is obviously not the case.

The only impact that our holding has on the tort of malicious prosecution is that an attorney will not be able to recover under that cause of action (or any other) against another attorney for conduct the second attorney engaged in as part of the discharge of his duties in representing a party in a lawsuit in which the first attorney also represented a party.

clients to monitor the actions taken by their attorneys when their attorneys are representing them, and require the clients to seize the helm of their representation at the slightest hint of intentional wrongful conduct. Most clients cannot possibly monitor their attorneys to the degree that would be required to meet such an obligation, and most, clearly, are not qualified for such monitoring, anyway. Imposing such an obligation on clients would, unjustly, make plaintiffs reluctant to file suit, and defendants far too tentative about defending themselves vigorously. This would not only chill the willingness of Texas citizens to vindicate their legal rights, it would make them ultimately responsible for their own legal representation—the very act for which they hire an attorney in the first place.

The record shows that the client-appellees are not implicated in their attorneys' conduct other than merely having entrusted their legal representation to the attorney-appellees. We overrule the appellants' second point of error and affirm the summary judgment granted to the client-appellees.[16]

### VII. The Summary Judgment in Favor of the "Insurance Company–Appellees"

In their third point of error, the appellants argue that the trial court erred in granting summary judgment to the "insurance company-appellees," who include Aetna Casualty & Surety Company, The Automobile Insurance Company of Hartford, Connecticut, Texas Lawyers Insurance Exchange, American Home Assurance Company, Lexington Insurance Company, and the American Psychiatric Association. As indicated above, these are the entities who paid for the defenses of some of the defendants in lawsuit number two.

The insurance company-appellees moved for summary judgment on the ground (among others) that, under this record, they cannot be liable for the conduct of the attorney-appellees in moving to hold Bradt in contempt. We agree with the insurance company-appellees.

The appellants argue that liability can be visited upon the insurance-company appellees for the wrongful acts of the attorneys they hired to represent their insureds because the insurance company-appellees had an attorney-client relationship with those attorneys. We disagree. There is no attorney-client relationship between an insurer and an attorney hired by the insurer just to provide a defense to one of the insurer's insureds. *Employers Casualty Co. v. Tilley,* 496 S.W.2d 552, 558 (Tex.1973). Even though such an attorney is typically selected by the insurer, paid by the insurer, and periodically reports to the insurer about the progress of the case against the insured, these facts do not mean that the insurer is the client. *Id.; Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves,* 929 F.2d 103, 108 (2d Cir.1991). In the context of insurance, the client is the insured. *Employers Casualty,* 496 S.W.2d at 558; *Continental Casualty,* 929 F.2d at 108. It is the insured to whom the attorney owes his allegiance in such a case, and the insured's interests that he represents. *Employers Casualty,* 496 S.W.2d at 558; *Continental Casualty,* 929 F.2d at 108. There was no attorney-client relationship between the attorney-appellees and the insurance company-appellees.

The appellants also contend that an agency relationship existed between the attorney-appellees and the insurance company-appellees. We agree. *See Ranger County Mut. Ins. Co. v. Guin,* 704 S.W.2d 813, 820 (Tex.App.—Texarkana 1985), *aff'd,* 723 S.W.2d 656 (Tex.1987); *Highway Ins. Underwriters v. Lufkin–Beaumont Motor Coaches, Inc.,* 215 S.W.2d 904, 932 (Tex.Civ. App.—Beaumont 1948, writ ref'd n.r.e.); *Blakely v. American Employers' Ins. Co.,* 424 F.2d 728, 734 (5th Cir.1970). Again, however, the mere existence of an agency relationship is not enough to visit tort liability on a principal. *Graham,* 384 S.W.2d at 898; *see Miller,* 665 S.W.2d at 145–46 (holding that even though agency relationship ex-

---

**16.** Because we affirm the summary judgment granted to the client-appellees on the ground discussed above, we need not here discuss the other grounds on which they moved for summary judgment.

isted, principal was not liable for tort of agent). It is fundamental that the agent's acts must be in some way wrongful before the principal can be "liable" for the acts of the agent.

Because the acts of the attorney-appellees were not wrongful, the appellants' case against the insurance company-appellees necessarily fails. A principal cannot possibly be in danger of liability for the acts of its agent when those acts are not wrongful.

We overrule point of error three and affirm the summary judgment granted to the insurance company-appellees.[17]

### VIII. The Denial of the Appellants' Motion for Summary Judgment

In their sixth point of error, the appellants contend that the trial court erred in denying their motion for summary judgment. We have held that the trial court was correct in granting the appellees' motions for summary judgment; it necessarily follows that the court did not err in denying the appellants' motion. We overrule point of error six.

### IX. The Insurance Company–Appellees' Cross–Point

■ In a cross-point, the insurance company-appellees assert that we should award damages from the appellants under Texas Rule of Appellate Procedure 84 for bringing this appeal. Only the insurance company-appellees have asked for damages for the appellants' filing of this appeal. However, we have the authority to impose damages under rule 84 even when an appellee does not ask for those damages. *McGuire v. Post Oak Lane Townhome Owners Ass'n,* 794 S.W.2d 66, 68 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *Dolenz v. A.B.,* 742 S.W.2d 82, 86 (Tex.App.—Dallas 1987, writ denied); TEX.R.APP.P. 84. We do so in this case.

Rule 84 states in relevant part:

In civil cases where the court of appeals shall determine that an appellant has taken an appeal for delay and without suffi-

cient cause, then the court may, as part of its judgment, award each prevailing appellee an amount not to exceed ten percent of the amount of damages awarded to such appellees as damages against such appellant. If there is no amount awarded to the prevailing appellee as money damages, then the court may award, as part of its judgment, each prevailing appellee an amount not to exceed ten times the total taxable costs as damages against such appellant.

TEX.R.APP.P. 84. The purpose of rule 84 is to shift to the appellant part of the expense and burden incurred by the appellee in defending against a frivolous appeal. *Peterson v. Dean Witter Reynolds, Inc.,* 805 S.W.2d 541, 554 (Tex.App.—Dallas 1991, no writ); *Dallas County Appraisal Dist. v. The Leaves, Inc.,* 742 S.W.2d 424, 431 (Tex. App.—Dallas 1987, writ denied).

"The right to appeal is a most sacred and valuable one. . . ." *In re Estate of Kidd,* 812 S.W.2d 356, 360 (Tex.App.—Amarillo 1991, writ denied). We should therefore apply rule 84 with prudence and caution, and only after careful deliberation. *Dyson Descendant Corp. v. Sonat Exploration Co.,* 861 S.W.2d 942, 952 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Exxon Corp. v. Shuttlesworth,* 800 S.W.2d 902, 908 (Tex.App.—Houston [14th Dist.] 1990, no writ).

■ In deciding whether to award damages under rule 84, we look at the record from the viewpoint of the advocate and determine whether it had reasonable grounds to believe the case could be reversed. *Dyson Descendant,* 861 S.W.2d at 952; *Hicks v. Western Funding, Inc.,* 809 S.W.2d 787, 788 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Shuttlesworth,* 800 S.W.2d at 908. Before assessing rule 84 damages against an appellant, we must conclude both that the appellant had no reasonable ground to believe the case would be reversed and that the appeal was not taken in good faith. *Dyson Descendant,* 861 S.W.2d at 952; *McGuire,* 794 S.W.2d at 68.

17. Because we affirm the summary judgment granted to the insurance company-appellees on the ground discussed above, we need not here discuss the other grounds on which they moved for summary judgment.

■ "Delay" under rule 84 does not necessarily mean delay that benefits the appellant in some specific way, financial or otherwise; it may also mean simply putting off the final disposition of the litigation. *The Leaves,* 742 S.W.2d at 431; *Dolenz,* 742 S.W.2d at 86. Under rule 84, "[i]t is the fact of delay that is important, not the reason." *The Leaves,* 742 S.W.2d at 431. "It is enough under the rule for us to find that [the appellant] has delayed the final resolution of this matter by this appeal." *Id.*

We will not permit spurious appeals, which unnecessarily burden parties and our already crowded docket, to go unpunished. *McGuire,* 794 S.W.2d at 69; *Dolenz,* 742 S.W.2d at 86. Such appeals take the court's attention from appeals filed in good faith, wasting court time that could and should be devoted to those appeals. *Bullock v. Sage Energy Co.,* 728 S.W.2d 465, 469 (Tex.App.—Austin 1987, writ ref'd n.r.e.). No litigant has the right to put a party to needless burden and expense or to waste a court's time that would otherwise be spent on the sacred task of adjudicating the valid disputes of Texas citizens.

Our reasons for awarding rule 84 damages are as follows.

### 1. The "blind eye"

■ Showing conscious indifference to settled rules of law—i.e., turning a "blind eye" to established law—is one factor to consider in deciding whether to award rule 84 damages. *Texas Employers' Ins. Ass'n v. Armstrong,* 774 S.W.2d 755, 756 (Tex.App.—Houston [1st Dist.] 1989, no writ); *Bullock,* 728 S.W.2d at 469. When an appellant discusses existing law adverse to its position, and raises a legitimate argument for the change of that law, we should not assess rule 84 damages. *Guzman v. Guzman,* 827 S.W.2d 445, 448 (Tex.App.—Corpus Christi 1992), *writ denied,* 843 S.W.2d 486 (Tex. 1992). On several points, the appellants have turned the "blind eye"; they have not discussed existing law that defeats some of their contentions, and have not argued that those rules of law should be changed.

■ For example, the appellants argued that there was an attorney-client relationship between the attorney-appellees and the insurance company-appellees. That there is an attorney-client relationship between an insurer and an attorney the insurer hires just to represent an insured is a theory that was laid to rest in this state by our supreme court approximately 21 years ago. *See Employers Casualty,* 496 S.W.2d at 558. No court in this state or in any other jurisdiction has made a contrary holding. Indeed, one court has stated that the rule is "clear beyond cavil." *See Continental Casualty,* 929 F.2d at 108. The appellants made no argument that we should change this by-now rudimentary rule.

As noted, this is but one example of the appellants turning the "blind eye" to well-established law that defeats one of their contentions.

### 2. Asserting a new cause of action on appeal

We also note that the appellants advanced a new cause of action, abuse of process, against the appellees in this appeal. Bradt, an experienced trial and appellate attorney, either knew or should have known that this is impermissible. However, by ignoring this fundamental rule, the appellants caused some of the appellees additional expense by obliging their attorneys to brief the impropriety of bringing this new cause of action on appeal. The appellants' arguments regarding why their petition should be read to state a cause of action for abuse of process were wholly implausible.

### 3. No response to the cross-point

The appellants did not even file a response to the insurance company-appellees' cross-point. This, too, is a fact for us to consider in deciding whether to impose damages under rule 84. *See Lewis v. Deaf Smith Elec. Coop.,* 768 S.W.2d 511, 514 (Tex.App.—Amarillo 1989, no writ).

In oral argument, Bradt did not address the subject of the cross-point until, at the end of his rebuttal, a justice asked him specifically about the cross-point. His one-sentence reply was that it had no merit because it

cannot not be said that his petition does not present a good faith argument for the extension of existing law. Bradt then immediately left the subject. His reply does not address the arguments in the insurance company-appellees' cross-point or have anything to do with the standards set out in rule 84.[18]

### 4. The summary judgment evidence

■ Perhaps the most compelling reason that we assess rule 84 damages in this case is that *the appellants could not have obtained a reversal of the summary judgments even if we had ruled that they have valid claims against all the appellees.* In other words, even if we had not held that West and Delmore are absolutely immune, that the appellants have no right of recovery against the attorney-appellees and the client-appellees, and that the appellants have no right of recovery against the insurance company-appellees on this record, the appellants still could not have obtained a reversal of the summary judgments.

In addition to the grounds discussed in this opinion, the appellees also moved for summary judgment on the ground that they had produced proper summary judgment proof that negates at least one element of each cause of action that the appellants brought. Their summary judgment evidence is competent in all respects, and the appellants do not attack it. Rather, the appellants urge that we must reverse the summary judgments because they raised a fact issue on all of the targeted elements with their *own* summary judgment evidence, thus precluding summary judgment.

The appellants' arguments find support only in Bradt's summary judgment affidavit, which is no support at all. It offers legal conclusions, hearsay, statements made on information and belief, and testimony not shown to be based on personal knowledge, on these elements, a fact pointed out by the appellees in the trial court and here. The affidavit is overtly incompetent. Bradt, an experienced trial and appellate attorney, either knew or should have known that such an affidavit would not support the appellants' arguments that they raised fact issues. He could not have reasonably believed that this affidavit would support an argument to reverse a summary judgment.

Because of the unmistakable incompetence of the only evidence that "supports" Bradt's arguments regarding fact issues, the appellants' attempt to reverse the trial court's judgment was absolutely bound to fail, even if we had ruled that the appellants have valid claims against all the appellees.[19] Because Bradt knew or should have known that he could not get a reversal of the trial court's judgment, he should not have brought this appeal.

### 5. Conclusion on rule 84 damages

Considering all of the above, we hold that the appellants did not have reasonable grounds to believe that the summary judgments granted to the appellees could be reversed. We conclude both that the appellants had no reasonable ground to believe that the case, or any part of it, would be reversed, and that the appeal was not taken in good faith. We can see no reason for the appeal of the summary judgments granted to

---

18. Apparently, counsel was referring to Texas Rule of Civil Procedure 13, which concerns the filing of frivolous pleadings, but not appeals taken for delay and without sufficient cause. Perhaps counsel did not read the insurance company-appellees' cross-point. It is likely that, if he did read it, he would have known that the insurance company-appellees were not seeking sanctions on appeal for the filing of a frivolous petition.

19. Our decision to award rule 84 damages is in no part based on the fact that the appellants have no right of recovery against the client-appellees and the attorney-appellees. This is the first time that we have considered whether these specific rights of recovery exist; thus, clearly, the appel-

lants should not be penalized for presenting us these issues. Nevertheless, the appellants knew or should have known that, even if we had held that these rights of recovery exist, we would have affirmed the summary judgments. The appellees' summary judgment proof negated at least one element of each of the appellants' causes of action, *and Bradt's affidavit, with its incompetent evidence, very obviously failed to raise a fact issue on any of the causes of action.* Thus, even presuming that the appellants had a right of recovery against every appellee, Bradt still did not have reasonable grounds to believe that any of the summary judgments granted to the appellees could be reversed.

the appellees other than to delay the final disposition of the appellants' case against them. As part of our judgment, we therefore award the appellees 10 times the total taxable costs as damages against the appellants, jointly and severally.

## X. Conclusion

Our system of justice should not allow everybody to sue everybody else for everything. This case presents some good examples of claims we should not allow.

We affirm the summary judgments granted to the appellees. Under rule 84, we also award the appellees 10 times the total taxable costs as damages against the appellants, jointly and severally.