IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 12, 2003 Session

## WANDA SHADWICK, INDIVIDUALLY, AND AS EXECUTRIX OF THE ESTATE OF KENNETH LEE PHILLIPS v. F. H. SHOEMAKER DISTRIBUTORS, INC., ET AL.

**Appeal from the Chancery Court for Scott County**
**No. 8282      Billy Joe White, Chancellor**

**FILED MAY 30, 2003**

**No. E2002-01525-COA-R3-CV**

Wanda Shadwick, individually, and as Executrix of the Estate of her common-law husband,[1] Kenneth Lee Phillips, sued F. H. Shoemaker Distributors, Inc., and Floyd H. Shoemaker, II. The theory of the lawsuit is that the Defendants were guilty of abuse of process in connection with the sale of certain real estate and personal property owned by Kenneth Lee Phillips at the time of his death to pay a claim of the Corporation against his Estate. This claim, in the amount of $25,079.54, had been sustained by the Probate Judge. We find that neither the Corporation nor Mr. Shoemaker are liable for the misdeeds of Max Huff, the first attorney employed by them. Having so found, we reverse the judgment both as to compensatory damages in the amount of $156,000 which, incidentally, was higher than Ms. Shadwick's testimony as to the wholesale value of the personal property, and of punitive damages in the amount of $250,000, which was the amount of the *ad damnum* clause in the complaint. Mr. Shoemaker filed a counter-complaint seeking to recover the amount paid in delinquent taxes as to a house and lot he purchased at the purported sale, as well as delinquent taxes owed thereon. On this issue the jury found in favor of Ms. Shadwick and we affirm this determination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ., joined.

---

[1]     Ms. Shadwick was declared to be Mr. Phillips' common-law wife by decree of the Chancery Court pursuant to a suit filed by Ms. Shadwick after his death.

Stephen A. Marcum, Huntsville, Tennessee, for the Appellants, F. H. Shoemaker Distributors, Inc., and Floyd H. Shoemaker, II

Johnny V. Dunaway, LaFollette, Tennessee, for the Appellee, Wanda Shadwick, individually, and as Executrix of the Estate of Kenneth Lee Phillips

**OPINION**

The Corporation and Mr. Shoemaker appeal the awards, raising several issues. However, the determinative one contends that the Trial Court was in error in not sustaining their motion for judgment notwithstanding the verdict in accordance with their motion for a directed verdict made at the close of all the proof. Mr. Shoemaker raises an issue insisting that he is entitled to a judgment against the Estate because he had paid an indebtedness secured by a deed of trust on a house and lot which he purportedly purchased at the sale. Mr. Shoemaker also contends he is entitled to a judgment for delinquent taxes as to this property, which he also paid.

The standard of review for determining the propriety of a directed verdict is well settled in this State and is set out in <u>Wharton Transport Corp. v. Bridges</u>, 606 S.W.2d 521, 525 (Tenn. 1980), as follows:

> "On review of the grant of a directed verdict on motion of a defendant, it is not the office of an appellate court to weigh the evidence. Rather, it must take the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary. The trial judge's action may be sustained only if there is no material evidence in the record that would support a verdict for the plaintiff, under any of the theories that he has advanced." *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978).

Following this rule, our task is to determine whether there is any material evidence to support the verdict. Tenn. R. App. P. 13(d). In doing so, we accept as true the statement of facts necessary for determination of this appeal set out in the Plaintiffs' brief, which we have edited slightly, principally to conform with the proof:

> Kenneth Phillips owned and operated the "Three Way Garage" at the intersection of Highways 27 and 52 in Elgin, Scott County, Tennessee for forty-six years. The business sold, in addition to automobile parts, gasoline, which Decedent purchased from Appellant F. H. Shoemaker Distributors, Inc. Appellant corporation is a family-owned oil distributorship which is operated by its president Appellant F. H. Shoemaker II. Appellant had been Decedent's primary fuel supplier for twelve years, selling him petroleum products, gasoline, diesel fuel, and kerosene. During these twelve years, Mr. Shoemaker maintained a "running account" for Decedent and his payments were attributed to the oldest

-2-

portion of his account. At the time of his death on July 10, 1997, Appellants claimed Decedent was indebted to the Appellant corporation for a sum of $25,079.54.

Defendant's Estate was opened by the Scott County Probate Court on July 24, 1997, and Letters of Administration were issued to his common law wife, Appellee Wanda Shadwick. Decedent and the Appellee had been romantically involved and had lived together since 1977 in a house Decedent built and owned in Elgin. Under the terms of Decedent's Will, Appellee, in addition to being designated Executrix of the Estate, was also named as primary beneficiary.

Following Decedent's death and the opening of his Estate for probate, Appellee continued to operate the Three Way Garage, purchasing her gasoline, as Decedent had done, from the Appellant corporation. Appellee made regular payments to Appellants during this time. Mr. Shoemaker, however, deviated from his customary course of dealing and standard practice with running accounts and credited only a portion of Appellee's payments to Decedent's outstanding debts. Appellee kept the garage open until November, 1998, when it was shut down as a result of Appellants' Execution Sale.

In August, 1997, Appellants' local attorney, Max Huff, filed a claim against the Estate for $25,079.54. Claims were also filed by the Mutual Loan and Thrift Company and by Methodist Medical Center. Appellee retained a local attorney, Philip Kazee, to assist her with administration of the Estate.

In May and June, 1998, well before the Court considered entering a Judgment with regard to Appellants' claim, Mr. Huff filed Notices of intent to sell off Decedent's realty and personalty. The realty consisted of the aforementioned home in Elgin as well as the building and lot on which Three Way Garage was located. In his Notice, Huff listed the value of the tracts as being $41,300.00 and $49,500.00, respectively. The personalty in question was comprised entirely of Decedent's inventory of automobile parts he had kept for sale in the three rooms of the garage. Huff scheduled a hearing for July, 1998 to adjudicate the Estate's alleged debt, but Appellee's counsel, Mr. Kazee, neglected to inform her of the hearing and raised no objection to Appellants' claim.

Following this hearing, the Probate Court issued, on July 22, 1998, an Order granting Appellant corporation Judgment against Decedent's Estate in the amount of $25,079.54, but specifically forbade Appellants' request for an immediate sale of any of the Estate property to satisfy the obligation. Mr. Shoemaker verbally approved Mr. Huff seeking issuance of executions . . . which were dated September 21 and October 9, 1998. While executions and garnishments are normally handled by the Sheriff's Department, in this instance

the executions were served on Appellee by Constable David Day and Attorney Huff. On the day the execution was served, October 12, Mr. Huff accompanied Constable Day to Decedent's business, although Mr. Day did not request him to do so. Upon their arrival, Huff took charge of the situation and told Appellee they were going to sell all the inventory and personal property of Three Way Garage and, if necessary, Decedent's house and garage. This encounter represented the first time Appellee had ever heard of the July 22, 1998 hearing or the ensuing Judgment. When she asked Mr. Huff if he planned simply to put her out into the street, he merely shrugged and walked away.

Constable Day and Mr. Huff then returned the served copies of the Executions to the Probate Clerk's Office. The Executions, while signed by Mr. Day, had been filled out beforehand . . . by Mr. Huff. The executions contained no inventory or identification of items levied upon. In dereliction of the statutory requirement that a debtor's personalty must be taken under the personal control of the officer and inventoried, neither Day nor Huff took steps to seize the automobile parts or catalog them. Huff subsequently placed an advertisement in a local newspaper announcing that a "Sheriff's Sale" of Decedent's realty and personalty would be held on November 20, 1998.

Mr. Huff conducted the sale of Decedent's real and personal property on the date provided in the notice. Although the auction had been advertised as a "Sheriff's Sale", the Scott County Sheriff in fact played no role in the matter - the entire affair was stage-managed by Mr. Huff. Between fifty and seventy people attended the auction that day, including Mr. Shoemaker. Huff sold the personalty (auto parts inventory of Three Way Garage) without having assessed the value of the proffered items. The inventory was purchased in its entirely by one person, Randy Corder ("Mr. Corder"), an auto parts dealer from Parker's Lake, Kentucky, for $2,275.00. While Constable Day was present and, pursuant to Huff's instructions, colleted the proceeds obtained from the sale of the personalty, neither he nor Mr. Huff made a list of the items sold to Corder. Huff then proceeded to sell the Three-Way Garage building to the Appellant corporation, for $5,000.00. Mr. Shoemaker then personally purchased Decedent's house for $35,000.00.

Mr. Day delivered the $2,275.00 he had collected from the sale of personalty to the Scott County Probate Court Clerk, Ms. Jan Burress ("Ms. Burress."). Huff took Appellant corporation's $5,000.00 check, representing payment for the purchase of Decedent's garage, to the Clerk's Office on December 11, 1998. Huff also brought with him the $35,000.00 check issued by Mr. Shoemaker for the purchase of Decedent's home and informed Ms. Burress that he wished to have the money placed in his private trust account to pay the costs of the sale. The clerk then indorsed the check over to Huff. Notwithstanding the fact that no Court Order had been entered authorizing the sale

nor disbursement of the sale proceeds and notwithstanding that the other creditors' claims had yet to be satisfied, Huff placed the $35,000.00 in his trust account and then without Court authorization used the funds to pay off the mortgage and back taxes owed on the property, which his clients/Appellants had purchased. He also deducted his own fee from the deposited funds.

On December 14, 1998, a "Sheriff's Report of Sale and Breakdown of Proceeds" was filed with the Probate Court. It had ostensibly been signed by Mr. Day, but Mr. Day's signature had in fact been signed by Huff without Day's permission.. These documents stated that $2,275.00 in proceeds had been obtained from the sale of Decedent's personalty. However, the Report did not specify the actual items sold. Also listed on the Breakdown was the $5,000.00 payment made on Decedent's garage. Following the payouts for back taxes and mortgage payoff, a total of $12,067.10 remained from the $35,000.00 Huff had placed in his trust account and this was paid back into the Court by a check issued by him on the day of the Report's filing.

On December 16, 1998, Ms. Burress issued, from the above tendered funds, a check to Mr. Day in the amount of $1,510.78, which represented his officer's commission on the Execution Sale. On the same day, she also issued checks to Appellants totaling $764.22 and $17,067.00, respectively. No Court Order authorized these payouts.

Following a meeting with Mr. Huff in which he gave Appellee until the beginning of the new year 1999 to either start paying Appellant Mr. Shoemaker as the new owner (of what had been her personal residence) monthly rent in the amount of $375.00 or vacate Decedent's house. Appellee then retained the undersigned counsel to contest the Sheriff's Sale of the Estate's assets. Appellee immediately filed a Petition with the Scott County Probate Court informing it of Mr. Huff's disregard of its July, 1998 Order and seeking to void the November 20, 1998 Sheriff's Sale." Appellee obtained from the Court an injunction forbidding Appellant to oust Appellee from her home pending the resolution of the action. Although Appellant contested Appellee's Petition, the Probate Court ultimately entered Orders voiding the Sale of Decedent's realty and personalty[2] on October 4, 1999 and December 20, 1999, respectively. Decedent's inventory had been purchased and moved out of State by a Kentucky resident.

. . . .

---

[2] Although the Probate Court found the sale of personalty void, it nevertheless surprisingly found that the buyer was a *bona fide* purchaser. Moreover, it found that, notwithstanding its order prohibiting sale of the Estate property, Mr. Huff was not guilty of contempt of court.

Appellee filed, simultaneously with the Probate Petition to Void the Sale, the Complaint in this case in Chancery Court seeking compensatory and punitive damages from Appellants for wrongful execution and abuse of process. A jury trial on this Petition was conducted on February 13 and 14, 2002. The evidence produced at trial demonstrated that Mr. Huff had unlawfully executed on Appellee's real and personal property, committing egregious errors in the preparation and service of the Executions, had sold off Decedent's realty and personalty at prices far below their true market value, and had failed to inventory the auto parts and personal property sold, causing damage to Appellee. When questioned on the discrepancy of the signatures on the Sheriff's Report of Sale" and the "Disbursement or Distribution of Proceeds," Mr. Huff claimed that he had been given signature authority by Mr. Day and had signed the Reports in his name and at his behest. At trial, however, Constable Day denied having given such authority to Huff and acknowledged the signatures were not his. Although he subsequently attempted to retract this statement upon redirect examination by Appellant's counsel, he was nevertheless forced to acknowledge, after further questioning by Appellee's counsel, that he had not in fact consented to Huff's signing his name on the documents.

Mr. Day also testified that, at the time he had served the Execution upon her, Appellee had told him the Estate had no personalty upon which to levy. However, when asked on redirect examination why he nonetheless completed and signed an Execution on Personalty without indicating an absence of personal property to attach, he was unable to provide a satisfactory answer.

In addition to the procedural irregularities surrounding the Executions and the disbursement of the proceeds, witness testimony also revealed that the sale of Decedent's personalty at a shockingly low price had resulted in a pointless depletion of the Estate's assets. Appellee testified that she had inventoried and priced the items of inventory and personal property at Decedent's business with the help of various supplier catalogs and that the garage inventory sold to Mr. Corder for $2,275.00 actually had a value of $125,000.00.

Her assessment was corroborated by Mr. Corder himself, who testified on Appellee's behalf at the hearing. Mr. Corder, the owner of "Randy's Auto Parts" in Parker's Lake, Kentucky operates a business selling new and used automobile parts, and he was recognized as an expert in his field by the Trial Court. He stated that he had purchased almost all Decedent's inventory and that there were a lot of parts. It had taken him at least three or four days to remove all of the parts with the help of several trucks and a U-Haul trailer. Mr. Corder further indicated that he thought he "got a real good deal" from the sale, as he had paid under $2,300.00 for the parts. He estimated that, had the parts been offered for sale under ordinary circumstances, they could have sold for well over $100,000.00.

Further proof of the garage inventory's value was provided by a local attorney, Harold Jeffers ("Mr. Jeffers"), who had prepared Decedent's tax returns for him from 1968 until his death in 1997. As the Three Way Garage had been a sole proprietorship, Mr. Jeffers had prepared 1040 form tax returns for Decedent, as well as a Schedule C form with attachments to set out the income and expenses for the business.

These forms revealed that Decedent had reported his gross receipts of his garage in 1995 as having been $249,782.00. The beginning value of his inventory for that year had been $240,558.00. At the year's end it was $197,620.00. Decedent's 1996 gross receipts equaled $243,109.00. His beginning inventory for that year had had a value of $197,620.00, his end inventory was valued at $196,850.00. Decedent's gross receipts for the final year of his life had equaled $181,653.00. His final inventory value was listed as $158,950.00.

Mr. Shoemaker attempted to downplay his personal culpability at trial by contending that Mr. Huff had been the agent only of Appellant corporation and that he had not been an active participant in Huff's actions against Appellee. He was nonetheless compelled to admit that, as president of Appellant corporation, he had failed to credit Appellee's current payments to it against the older debts incurred by Decedent and had only moved against her because he had heard rumors she was planning to liquidate the Estate. Shoemaker had also personally approved of Huff procuring Executions on Decedent's property and preparing a deed to the Appellee's residence. He had attended the execution sale arranged by Huff and had there purchased, for himself and Appellant corporation, the only realty that had belonged to Decedent, at prices well below even the value Huff himself had placed on the realty in his Notice of Intent to Sell. Finally, Shoemaker had ordered Huff to prepare, for himself and Appellant corporation, deeds to the property acquired from the Estate at the void sale

Certain other undisputed facts should be considered in addition to those hereinbefore stated from the Plaintiff's brief.

The Plaintiff sold one tract of land, as well as certain personal property before the claim of Shoemaker, Inc., was filed. It should also be noted that although the order of the Probate Judge entered on July 24, 1998, did provide that there would be no sale. It also stated that judgment was granted in favor of Shoemaker "for which execution will issue." A number of people attended the sale of personal property when it was purchased for the sum of $2,274.00, although there was considerable proof in the record to show it was worth in excess of $100,000. As to the garage property which was bought by the Corporation, there was only one other bid in the amount of $500, that the bidding as to the house and lot sold to Mr. Shoemaker for $35,000. Mr. Shoemaker did not know of any problem with the process. He did answer in the affirmative when asked by the Plaintiff's counsel whether "Max Huff was your attorney and your agent?" A few questions

thereafter, when the question was put in another context, Mr. Shoemaker stated that Mr. Huff was not his agent.[3]

The principal fallacy in the trial of this case was the assumption by counsel for the Plaintiff that Mr. Huff was an agent of the Defendants, and as a result, they are vicariously liable for his misdeeds.

A number of issues were raised by the Defendants. However, we believe that issue number one is dispositive of this case. In *Givens v. Mullikin*, 75 S.W.3d 383 (Tenn. 2002),[4] our Supreme Court clearly states that the general rule an attorney is not an agent, but rather an independent contractor, although under certain circumstances the client may be vicariously liable for the acts of the attorney. Before, however, the client can be held liable vicariously, the tortuous acts complained of must have been "directed, commanded or knowingly authorized by the client."

In reaching this conclusion, our Supreme Court quoted with approval from a case decided by the Texas Court of Appeals, as follows:

> Unless a client is implicated in some way other than merely being represented by the attorney alleged to have committed the [tortious] conduct, the client cannot be liable for the attorney's conduct. A contrary holding would in effect obligate clients to monitor the actions taken by their attorneys when their attorneys are representing them, and require the clients to seize the helm of their representation at the slightest hint of [tortious] conduct. Most clients cannot possible monitor their attorneys to the degree that would be required to meet such an obligation, and most, clearly, are not qualified for such monitoring, anyway.

*Bradt v. West*, 892 S.W.2d 56, 76-77 (Tex. App. 1994).

We have searched the record in this case and find no proof that would justify a finding that Mr. Shoemaker directed, commanded or knowingly authorized the misdeeds committed by his attorney. The only proof touching on the question is as follows:

"Q     Did you have any personal participation in the issuance of Execution and Garnishment?

---

[3]     Mr. Shoemaker's characterization of his and Mr. Huff's relationship is really of no consequence. Whether a person is an agent of another is a question of law and the law is clear that in this case the attorney was an independent contractor. *Givens v. Mullikin, infra.*

[4]     In fairness to the Trial Judge, it should be noted that the opinion in *Givens* was filed after the trial had concluded. It had, however, been filed prior to disposition of the Court of post-trial motions by the Defendants, but it does not appear it was ever called to the Trial Court's attention.

A     Only verbal.

Q     Tell me about the verbal.

A     I just approved it."

We emphasize, as already noted, that issuance of an execution was authorized by the Probate Judge.

Notwithstanding *Givens*, counsel for the Plaintiff contends that the traditional *respondeat superior* doctrine should apply, which would render the Defendants liable for the acts of their attorney. We cannot agree. Suppose, for instance, a client directs his attorney to interview a witness and the attorney, while on this mission, speeds through a 15 mile per hour school speed zone at 75 miles per hour, injuring students who were leaving school after classes had been dismissed. Would the client be liable for damages resulting from injuries to the students? We think not.

We conclude in light of *Givens* and the proof introduced, that neither Mr. Shoemaker nor the Corporation is liable to the Plaintiff for the tortious acts committed in connection with the sale of the real and personal property.

Finally as to this point, we are somewhat puzzled that apparently no suit was ever brought against Mr. Huff or Mr. Day, who under the record were perpetrators of the acts complained of. Also, it does not appear that a suit was filed against Ms. Shadwick's first attorney who allowed a judgment to be entered in the Probate Court in favor of the Corporation without–according to Ms. Shadwick's testimony–consulting her, or even advising her such a judgment had been rendered.

Because the award of compensatory damages is reversed, the award of punitive damages must also be reversed. *Liberty Mutual Insurance Company v. Stevenson*, 368 S.W.2d 760 (Tenn. 1963); *Roy v. Diamond*, 16 S.W.3d 783 (Tenn. Ct. App. 1999).

As to the issue contending Mr. Shoemaker was entitled to recoup his payment of the outstanding mortgage and the delinquent taxes on the house and lot he purported to purchase, we first observe that his attorney made these payments and that Mr. Shoemaker never obtained a deed to the property. While it might be argued that the Estate was unjustly enriched and, consequently, Mr. Shoemaker is entitled to recover under the theory of *quantum meruit*, we first observe that this theory appears only to be applicable upon the furnishing of goods and services, neither of which occurred in the case at bar. We also note the requirements relative to application of the doctrine found in the recent case of *Doe v. HCA Health Services of Tennessee*, 46 S.W.3d 191, 197 (Tenn. 2001), which quotes with approval from *Swafford v. Harris*, 967 S.W.2d 319 (Tenn. 1998), as follows:

A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:

(1) There is no existing, enforceable contract between the parties covering the same subject matter;
(2) The party seeking recovery proves that it provided valuable goods or services;
(3) The party to be charged received the goods or services;
(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
(5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

We do not believe the factors justifying such a recovery have been met in this case.

We also note that the counter-complaint was mentioned only fleetingly in the opening statement of counsel for the Defendants and not at all in his argument at the conclusion of the trial. Further, it appears that although counsel for the parties submitted their contentions as to the jury charge, no mention was made of the counter-claim and the jury was not charged in anywise with respect thereto.

Given the foregoing circumstances, we are disinclined to disturb the jury verdict which was approved by the Trial Court finding in favor of the Counter-Defendant, Ms. Shadwick.

For the foregoing reasons the judgment of the Trial Court is reversed in part, affirmed in part and the cause remanded for collection of costs below. Costs both below and on appeal are adjudged one-half to Wanda Shadwick, Individually, and as Executrix of the Estate of Kenneth Lee Phillips, and one-half to F. H. Shoemaker Distributors, Inc., and Floyd H. Shoemaker, II.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE