Opinion issued August 28, 2008

 
















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00719-CV






ANTHONY AUTHORLEE, DEXTER BURNETT,

ROBERT DEROUSSELLE, JOHN HENRY YOUNG,

JEROME STUBBLEFIELD, AND FLOYD MORAN, Appellants


V.


TUBOSCOPE VETCO INTERNATIONAL, INC., AMF INCORPORATED,
AND MINSTAR, INC., Appellees






On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 1998-03885B







O P I N I O N

 In six issues, appellants, who were settling plaintiffs in the underlying lawsuit,
seek to overturn the trial court's denial of their motion for new trial. Appellants argue
here, as they did in the trial court, that their agreed judgment should be set aside as
"void as against public policy" because their trial lawyers did not tell them it was an
aggregate settlement and because their trial lawyers, along with the appellees,
committed fraud.

 We affirm.

BACKGROUND


History

 This is a dispute about the propriety of settlements in a mass tort case. Before
the lawsuit at issue in this appeal, appellants' trial attorney, Shelton Smith, had
represented other plaintiffs in silicosis cases against appellees, the "AMF
defendants," establishing a course of conduct for negotiating and resolving these
claims with Daniel Shank, counsel for the AMF defendants. This course of conduct
included evaluating the merits of each plaintiff's case based on work history, medical
diagnosis and impairment, and other factors that might have impacted the outcome
at trial. In those prior 40 lawsuits, Smith had recovered about $40 million in
settlements for his clients.

Initial Settlement Negotiations

 Appellants were among 176 plaintiffs who sued Tuboscope Vetco
International, Inc., AMF, Inc., and Minstar, Inc., along with other defendants, for
injuries they alleged were caused by their occupational exposure to silica while
working for AMF Tuboscope in Midland, Texas. In January 1999, appellants' trial
attorneys, Shelton Smith and Scott Hooper, approached appellees with vague, initial
settlement demands. In one letter, Smith wrote:

 I am presently representing 55 former AMF Tuboscope sandblasters
who suffer from silicosis or mixed dust pneumonoconiosis as a result of
their employment at Tuboscope. Each of these 55 men has a serious
occupational lung disease. . . . 


 As of this date, I have filed 25 lawsuits against AMF, Inc. The other 30
diagnosed cases are ready to be filed. There may be more . . . .


 From January through May, Smith and Hooper had a series of
conversations--in person, by telephone, and by mail--with Daniel Shank, counsel
for the AMF Defendants. They spoke about factors that would be involved in any
settlement. Shank proposed, on behalf of his clients and their insurers, that all of
Smith's silicosis claims be settled at one time, using the term "global" in several
communications. Shank wrote:

 At this point in time, my client and its insurers are not interested in
negotiating a settlement in individual cases on a case-by-case basis. 
Furthermore, my client and its [insurance] carriers are not interested in
negotiating a resolution of cases on a subgroup basis. However, my
client and its carriers are interested in a global settlement proposal. 
Accordingly, if you wish to resolve these cases, I would suggest that you
proceed with preparing a global settlement proposal. . . . If the parties
seem reasonably in contact with each other, then it may be appropriate
for all parties to proceed with a global mediation . . . .


 To the extent that my client and its insurers are not able to proceed with
a global resolution of these matters, please be advised that my client and
its insurers are not interested at this time in negotiating settlements on
a piecemeal, case by case or subgroup basis. Rather, they would prefer
pursuing a global approach without being distracted by piecemeal or
subgroup negotiations.


 Shank later testified that he and his clients were interested only in a global
resolution to ensure that cases with similar liability and damages would settle for
similar amounts. He said, "We were dealing with the strategy where he would hitch
his wagon to a highly valued case and then later on we would be fighting about
whether or not an apple is an apple or an apple is an orange." 

Preparing for Mediation

 The parties agreed to go to mediation in July. Before mediation, Shank
suggested that they evaluate the first 21 cases to determine a method for resolving
Smith's inventory of claims. Shank suggested this because he had more information
on those 21 plaintiffs than on the other plaintiffs: they had deposed the plaintiffs,
reviewed their medical records, and obtained "defense IMEs." (1) In addition, Smith
sent Shank several boxes full of information about individual plaintiffs, including
information on all the appellants. However, only some plaintiffs had complete case
evaluations, including diagnosing medical reports and social security records
verifying employment at AMF Tuboscope. For example, only summaries but no
medical reports were available for Anthony Authorlee. 

 Smith also contacted his clients before mediation. In a June 30, 1999 letter,
Smith told his clients, "There are very important events in July regarding your AMF
Tuboscope case." He invited about half of the plaintiffs to a meeting to provide
details about the upcoming mediation and stressed the importance of attending the
meeting. With the invitation, Smith sent a report with questions and answers about
the status of the litigation. In this report, Smith explained:

 We have a mediation scheduled for the second week of July. This is a
negotiation session where we will meet with attorneys and insurance
representatives for AMF and discuss settlement possibilities for our
AMF clients. Your case could potentially be discussed at this three day
session. 


 To prepare for the possibility of discussing your case, we have
computerized a large amount of information about you. Some of that
information is printed on the Client Information Sheet. We need you to
review that information right now.


 . . . 


 We know you have questions. But with the AMF mediation a few days
away and since we represent more than 300 AMF clients, we simply
cannot provide our typical personalized service for the next two weeks. 
We need to focus all of our attention on preparing for this session with
the AMF attorneys.


 . . .


 NO ONE ELSE EXCEPT YOU AND YOUR SPOUSE MAY ATTEND. 
THIS WILL BE A MEETING PROTECTED BY ATTORNEY-CLIENT
PRIVILEGE, NO FRIENDS OR OTHER PERSONS MAY ATTEND.


 . . . 

 

 A very detailed overview of the AMF cases will be presented. Shelton
Smith is your lead attorney who has successfully pursued cases against
AMF for 15 years. He will be reviewing the current situation and will
be discussing details of your case. Shelton has settled more than 40
cases against AMF.

 . . . 

 

 Because of space limitations, we are only meeting with about half our
clients on July 10. Another meeting or meetings will be held this
summer for the rest of our clients. ONLY THOSE CLIENTS WITH AN
INVITATION LETTER SHOULD ATTEND THE MEETING.


 . . .


 Though it is possible that some of these cases could be resolved soon,
nothing is certain. Anything could happen. It is possible that a
reasonable solution involving your case may not be resolved for months
or possibly even years.


 . . . 


 The upcoming mediation will be the first time we have discussed the
possibility of resolving all of our AMF cases with the AMF lawyers. 
But there is ABSOLUTELY NO GUARANTEE THAT ANY
PROGRESS WILL BE MADE. We will know more in two weeks.


Mediation

 According to Shank, several plaintiffs as well as representatives of appellees'
lead insurance carriers attended the mediation. The attorneys spent the first few days
trying to agree on what criteria to use to establish the value of each plaintiff's claim. 
For example, Smith had a matrix in which he had ranked the relative value of each
plaintiff's claim based on factors like: (1) length of exposure to silica while working
at the Tuboscope plant, (2) age, (3) marital status, (4) number and age of children,
(5) severity of diagnosis and whether the diagnosis was made by a doctor that the
AMF defendants respected, (6) prior drug use, and other factors that may have
influenced a jury verdict at trial. On the other hand, appellees had their own matrix,
and they wanted to focus on exposure dates, pulmonary function test results, and
impairment ratings.

 Smith would not agree to appellees' criteria. He later testified that most of his
clients were not symptomatic, "[V]ery few of these men ever--ever had a complaint
about a pulmonary problem. Very few, very few ever saw a doctor for one or had any
kind of treatment." He testified that at least one appellant's case would have been
"valueless" had he agreed to appellees' settlement criteria. (2)

 Both Smith and Hooper stated that they did not discuss appellants' individual
cases during the mediation. Smith testified that they discussed a few cases
individually as a means of reality testing the effect of the criteria each side proposed.
Smith testified that they did not discuss settling any particular plaintiff's case during
the first few days of the mediation. Scott Hooper testified that he was not aware of
any individual negotiation for Anthony Authorlee. Smith also said that at least
twenty additional plaintiffs were added to the litigation after the mediation.

 Shank also testified that he understood that they were discussing not just the
150 or so positively diagnosed plaintiffs and that there would be additional plaintiffs
added to the group prior to settlement. He said that there were some offers made
during the mediation, "I think there were matrix predicated conditional offers made
because obviously we had to get carrier approval . . . there were discussions involving
numbers and matrixes, and I believe we floated some of those with an actual
number . . . ."

 Most notably, however, Shank testified that he had no settlement authority at
the mediation. He said he could only agree to a framework for settlement, saying, "I
was making proposals that I would recommend to my clients . . . ." Shank explained
that over the period for which liability may exist for AMF Tuboscope, roughly from
1961 to 1986, when the plants stopped using silica, there were numerous different
insurance policies issued to AMF Tuboscope by different carriers. Shank explained
that he was not "coverage counsel" for the AMF defendants and that other lawyers
were responsible for allocations among the various insurance carriers depending on
the facts of a particular case. He testified that before any settlement could be funded,
coverage counsel for the AMF defendants would establish where and when the
diagnosed individual plaintiff worked and in what job function (i.e., a job that
exposed him to silica or not) based on Social Security records and AMF Tuboscope
personnel records. Using this information, coverage counsel would allocate
responsibility in order to seek coverage from the insurance carriers. Shank said that
seven to fifteen separate carriers might be involved in an individual settlement and
different layers of insurance may also be involved. Therefore, each settlement had
to be done individually. 

 After several days of fruitless mediation about which factors should be used to
value the plaintiffs' claims, they switched gears and decided to talk about a total
amount of money needed to resolve all the claims at one time. Appellees' attorney
agreed that so long as the individual demands did not exceed $45 million, he would
recommend to his clients and their many insurance carriers to settle the claims, but
only if 95% of Smith's clients agreed. (3) They signed a Rule 11 agreement
memorializing their understanding, although the Rule 11 agreement did not include
the $45 million figure--or any sum of money--for settling Smith's inventory of
claims. 

Post-Mediation Negotiations and Settlement Agreements

 After the mediation, appellants' attorneys recalculated the settlement amounts
for each plaintiff, including about twenty plaintiffs who were diagnosed with silicosis
after the mediation. Smith then sent each appellant a letter detailing an offer of
settlement, based on the numbers he calculated using his matrix. The letters were
substantially the same, except for the settlement amounts, which, for the appellants,
ranged from $209,000 to $662,000, and which were characterized as a "final offer"
made by defendants. (4) All but one or two plaintiffs of the 178 or 179 pending claims
agreed to settle.

 In early August, each appellant signed an authorization to settle, which
specifically acknowledged that each appellant's claim was negotiated with other
similar claims but was not part of an aggregate settlement. After each appellant
signed the authorization to settle, appellant's attorneys forwarded an individual,
formal demand letter to appellees, which appellees could accept or reject. From mid-September through mid-October, appellees accepted all but one demand, at one point
asking for additional time to review certain plaintiffs' settlement demands.

 In late October, before the settlements actually closed, Hooper wrote to Shank,
requesting certain additions and revisions to the Settlement Agreements, including
the addition of the following language:

 This Agreement supersedes all previous agreements, written or oral. 
Plaintiff and Defendants have been involved in lengthy settlement
negotiations, involving a variety of settlement offers, and proposals. 
This agreement reflects the final settlement offer made by the
Defendants and accepted by the Plaintiff. Any and all previous
settlement offers, by either party, are hereby revoked.


 Defendants' payment of the settlement amounts stated herein are [sic]
independent of its agreement to make payments to other plaintiffs in the
same or related lawsuits. Plaintiff and Defendants have negotiated this
settlement based upon the individual merits of the Plaintiff's claims. 
Defendants have not made any aggregate settlement offer and this
settlement is not part of any aggregate settlement.


 Nothing in this Agreement shall be construed as a release, discharge,
settlement or compromise of Plaintiff's right to pursue Workers'
Compensation benefits.


 The release, settlement, assignment and indemnity of claims stated in
this Agreement do not apply to Plaintiff's claims against [the non-settling defendants].


This language was inserted verbatim, and Shank later testified by affidavit, "This
language was drafted by Plaintiffs' attorneys and was inserted into the Settlement
Agreements without change at their request. Defendants did not seek to include,
draft, or edit this language."

 In November, each appellant signed a Settlement, Indemnity and Release
agreement and an affidavit that stated each had relied on his lawyer's legal advice. 
Later that month, the 129th District Court granted the 177 settling plaintiffs' motion
to consolidate their cases. (5) In December, the trial court entered an agreed judgment
on the settlement. 



Appellants Hire New Counsel

 In 2002, four appellants and eleven other settling plaintiffs terminated their
attorney-client relationship with Shelton Smith & Associates, engaged Robins, Cloud,
Greenwood & Lubel, LLP, and moved to retain and sever their claims, which were
set to be dismissed for want of prosecution. The court granted their motion. In 2004,
all six appellants sued their trial attorneys, Smith and Hooper, and the appellees,
alleging that Smith fraudulently induced them to enter into an impermissible
aggregate settlement and that appellees conspired in that process.

The Motion for New Trial

 In May 2006, more than six years after the entry of the agreed judgment in
appellants' silicosis cases, the trial court severed appellants' claims, making the
agreed judgment final as to them. Appellants then filed a motion for new trial,
arguing that: (1) the settlement agreements were void because they violated the
aggregate settlement rule in the Texas Rules of Professional Conduct, and therefore,
the agreed judgment was also void; (2) Tuboscope Vetco, AMF, and Minstar
committed actual fraud in connection with the settlements; and/or (3) Tuboscope
Vetco, AMF, and Minstar conspired to commit fraud with appellants' trial counsel
in connection with the settlements. 


Trial Court Denies Motion for New Trial

 Two months later, the trial court (6) denied appellants' motion for new trial. The
trial court's order denying the motion for new trial included significant findings of
fact and conclusions of law. First, the trial court found that appellants' trial attorney
"violated Rule 1.08(f) of the Texas Disciplinary Rules, the 'aggregate settlement
rule.'" However, the trial court concluded that such violation did not void the agreed
judgment. Next, the trial court concluded that there was no actual fraud committed
by appellees because appellants could not prove reliance and because it is
"unreasonable for a person to rely on statements of the opposing party in settling
litigation." (7) Finally, the trial court concluded that "there can be no conspiracy to
commit fraud in the litigation setting."

Appeal

 Appellants challenge the trial court's denial of their motion for new trial with
six issues on appeal:

(1) Did the trial court correctly find that there was an aggregate settlement
between the AMF defendants and the original six plaintiffs that sued them?


(2) Are undisclosed aggregate settlements void as a matter of public policy?


(3) If undisclosed aggregate settlements are void as a matter of public policy, are
they nevertheless enforceable by defendants that enter into them with the
knowledge that the Plaintiffs' lawyers have deceived their clients about the
character of the settlement?


(4) If undisclosed aggregate settlements are void as a matter of public policy, are
they nevertheless enforceable by defendants who collude with Plaintiffs'
counsel and allow the Plaintiffs' lawyers to deceive their clients about the
character of the settlement?


(5) If undisclosed aggregate settlements are void as a matter of public policy, are
they nevertheless enforceable by defendants who knowingly include false
representations in settlement agreements prepared by defendants?


(6) Does a defendant have a duty to provide all material information about the true
nature of a settlement once he voluntarily includes misleading representations
about the nature of the settlement in his settlement papers? If a defendant
breaches such a duty and thereafter secures a settlement, should such a
settlement and agreed judgment be set aside as a matter of law?

Motion for New Trial

 We review a trial court's denial of a motion for new trial for abuse of
discretion. Jackson v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983), overruled on
other grounds by Moritz v. Preiss, 121 S.W.3d 715, 720-21 (Tex. 2003). With
respect to determination of the facts, we will not substitute our judgment for that of
the trial court. Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992). Even if the
reviewing court would have decided the issue differently, it cannot disturb the trial
court's decision unless the decision is shown to be arbitrary and unreasonable. Id. at
840. On the other hand, review of a trial court's determination of the legal principles
controlling its ruling is much less deferential. Id. A trial court has no discretion in
determining what the law is or applying the law to the facts. Id. Thus, a clear failure
by the trial court to analyze or apply the law correctly will constitute an abuse of
discretion and may result in appellate reversal. Id. 

Agreed Judgment

 In general, a party may not appeal from or attack a judgment to which he has
agreed, absent allegation and proof of fraud, misrepresentation, or collusion. Henke
v. Peoples State Bank of Hallettsville, 6 S.W.3d 717, 720 (Tex. App.--Corpus Christi
1999, pet dism'd w.o.j.); Bexar County Criminal Dist. Attorney's Office v. Mayo,
773 S.W.2d 642, 644 (Tex. App.--San Antonio 1989, no writ); Gillum v. Republic
Health Corp., 778 S.W.2d 558, 562 (Tex. App.--Dallas 1989, no writ);
Charalambous v. Jean Lafitte Corp., 652 S.W.2d 521, 525 (Tex. App.--El Paso
1983, writ ref'd n.r.e.). Therefore, absent allegation and proof of fraud,
misrepresentation, or collusion, appellants would not be entitled to a new trial.Fraud

 Appellants argue that "AMF's lawyers knowingly agreed to insert false
statements in the settlement documents to protect Smith and Hooper from divulging
the aggregate settlement to their clients." The allegedly false statements were:

 Defendants' payment of the settlement amounts stated herein are
independent of its agreement to make payments to other plaintiffs in the
same or related lawsuits. Plaintiff and Defendants have negotiated this
settlement based upon the individual merits of the Plaintiff's claims. 
Defendants have not made any aggregate settlement offer and this
settlement is not part of any aggregate settlement.


 The elements of fraud are that: (1) a material representation was made; (2) the
representation was false; (3) when the representation was made, the speaker knew it
was false or made it recklessly without any knowledge of the truth and as a positive
assertion; (4) the speaker made the representation with the intent that the other party
should act upon it; (5) the party acted in reliance on the representation; and (6) the
party thereby suffered injury. In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758
(Tex. 2001) (orig. proceeding) (citing Formosa Plastics Corp. v. Presidio Eng'rs &
Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998)). As the trial court noted, "A
crucial element to a fraud cause of action is reliance. Appellants all testified that they
did not rely on any statements by appellees or on the contents of the settlement
agreement with the alleged false statements or omissions." In fact, in their brief,
appellants expressly concede that they did not rely on any statements by appellees or
on the contents of the settlement agreement with the alleged false statements or
omissions.

 The trial court found that appellees did not commit actual fraud. We cannot
say the trial court erred in so doing. Therefore, we hold that the trial court did not
abuse its discretion by denying the motion for new trial on this basis. Because we
construe appellants' issues 5 and 6 as relating to their allegations that appellees
committed fraud, we overrule issues 5 and 6.

Conspiracy to Commit Fraud or Collusion

 Similarly, we construe appellants' issues 3 and 4 as their argument that the trial
court erred by denying the motion for new trial because appellees allegedly colluded
with or conspired with appellants' trial counsel to commit fraud on appellants. The
trial court held, "[T]here can be no conspiracy to commit fraud in the litigation
setting." We agree.

 In Bradt v. West, we found no cause of action by one attorney against his
former adversary for litigation conduct. 892 S.W.2d 56, 71-2 (Tex. App.--Houston
[1st Dist.] 1994, writ denied). We noted that an attorney must zealously represent his
clients within the bounds of the law because "the public has an interest in 'loyal,
faithful and aggressive representation by the legal profession.'" Id. at 71 (citing
Maynard v. Cabellero, 752 S.W.2d 719, 721 (Tex. App.--El Paso 1988, writ denied). 
 Finding no private cause of action for litigation conduct, we opined:

 An attorney should not go into court knowing that he may be sued by the
other side's attorney for something he does in the course of representing
his client; such a policy would favor tentative representation, not the
zealous representation that our profession rightly regards as an ideal and
that the public has a right to expect. That policy would dilute the vigor
with which Texas attorneys represent their clients, which would not be
in the best interests of justice.


Id. at 72. Moreover, we explicitly noted that unmeritorious litigation conduct could
properly be the subject of sanctions, not a private cause of action. Id. Other courts
have agreed that it is the type of conduct in which the attorney engages, not whether
it was meritorious in the underlying lawsuit that governs a party's right to recovery
against an adversary's former attorney. See Taco Bell Corp. v. Cracken, 939 F. Supp
528, 532 (N.D. Tex. 1996); Chapman Children's Trust v. Porter & Hedges,
32 S.W.3d 429, 440 (Tex. App.--Houston [14th Dist.] 2000, pet. denied).

 Here the trial court noted, "All of the actions of the defendants were in
connection with the settlement of a lawsuit." We cannot say the trial court abused
its discretion in denying the motion for new trial on this basis. We overrule
appellants' issues 3 and 4.

Aggregate Settlements

 Finally, as an alternative to fraud, collusion, or conspiracy to commit fraud,
appellants argue that the settlement agreements and, therefore, the agreed judgment
are void because the settlement agreements were undisclosed aggregate settlements
and, as such, were void as against public policy. We disagree.

 An aggregate settlement occurs when an attorney, who represents two or more
clients, settles the entire case on behalf of those clients without individual
negotiations on behalf of any one client. Arce v. Burrow, 958 S.W.2d 239, 245
(Tex. App.--Houston [14th Dist.] 1997) reversed in part on other grounds, Burrow
v. Arce, 997 S.W.2d 229, 247 (Tex. 1999); see Scrivner v. Hobson, 854 S.W.2d 148,
152 (Tex. App.--Houston [1st Dist.] 1993, orig. proceeding). The Texas
Disciplinary Rules of Professional Conduct prohibit only undisclosed aggregate
settlements. 

 A lawyer who represents two or more clients shall not participate in
making an aggregate settlement of the claims of or against the clients . . .
unless each client has consented after consultation, including disclosure
of the existence and nature of all the claims or pleas involved and of the
nature and extent of the participation of each person in the settlement. Tex. Disciplinary R. Prof'l Conduct 1.08(f) (1991), reprinted in Tex. Gov't
Code Ann., tit. 2, subtit. G app. A (Vernon Pamph. 1997) (State Bar R. art. X, § 9).

 Prior to the settlements, both sides conducted discovery, and they had
numerous and lengthy discussions regarding individual cases as well as similarities
and differences among the various cases. Moreover, in their authorizations to settle,
each appellant acknowledged that his claim was negotiated with other similar claims. 
Appellants argue, essentially, that there were no specific, individual negotiations
during the mediation, and there were not back-and-forth, demand-and-offer
discussions after the mediation regarding their settlements. We find no
authority--and they do not direct us to any--that proscribes the manner in which
negotiations must occur or that requires haggling or horse-trading between the
parties. After the mediation, appellants made settlement demands on appellees,
based on factors specific to each of their claims, and appellees accepted their
demands and paid them. This is the essence of negotiation. 

 Thus, there were individual negotiations on behalf of appellants. The Rule 11
agreement did not actually settle any case, let alone all of the cases as an aggregate
settlement. No amount of money was stated in the Rule 11 agreement, and, indeed,
the Rule 11 agreement did not bind the defendants to a lump sum to be paid to the
plaintiffs' lawyers and divided among his clients. Shank testified that he had no
settlement authority at the mediation. Later, appellees rejected one plaintiff's
settlement demand. 

 In addition, as Shank explained in his deposition, each appellant's case was
settled individually, after a lengthy negotiation process involving individual offers
and acceptances. Shank explained that each settlement had to be negotiated
individually in order to determine issues of insurance coverage and allocation. Therefore, we hold that the trial court erred in concluding that the settlements
here were aggregate settlements. We overrule appellants' first issue. Because we
conclude that the settlements at issue in this case were not aggregate settlements, we
decline to address appellants' second issue, which asks whether undisclosed
aggregate settlements are void as against public policy. 

Conclusion

 We affirm the judgment of the trial court.




 Sam Nuchia

 Justice



Panel consists of Justices Nuchia, Keyes, and Higley.


Justice Keyes, dissenting.


1. In mass-tort litigation, IMEs, or independent medical evaluations, are not independent in the
traditional sense, but rather IME is used as a term of art for a medical examination conducted by a
doctor of the defendant's choosing. Usually only one IME is done per plaintiff, with the defendants
sharing in the cost and using the same report in litigation.
2. "Dan's [appellees' attorney] whole deal when he was arguing about this matrix, you know,
he wanted--he wanted--he wanted a matrix that was heavily weighted to exposure dates, FVC
[forced vital capacity], and impairment rating. And if I would have ever agreed to that, then
Dexter--Dexter Burnett's case would have been basically worthless because he had 115 percent
predicted FVC, which, you know, is no impairment, I mean, you know, zero impairment. And if I
would have ever agreed to Dan's form of matrix, that case would have been basically valueless." 
3. Smith testified, "My understanding with Dan [appellees' attorney] was that if all of my
clients made individual demands, that when you added them all up totaled in the range of $45
million, that he would then recommend to his carriers and his client that they--that they pay those
demands." 
4. Anthony Authorlee ($488,000), Dexter Burnett ($384,000), Robert Deroesselle ($209,000),
Floyd Moran ($314,000), Jerome Stubblefield ($384,000), John Young ($662,000).
5. They were consolidated in Cause No. 98-03885, John George Baxter, et al. v. Tuboscope
Vetco International, Inc., formerly AMF, Inc., et al., in the 80th District Court of Harris County,
Texas. 
6. This "trial court" is the 295th District Court of Harris County, Texas.
7. ' '